# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRENTICE FOREMAN,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>TRENT ALLEN,<br><br>　　　　Respondent. | Case No. 1:23-cv-00390-JLT-EPG-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS AND DENIAL OF PETITIONER'S REQUEST TO STAY |

Petitioner Prentice Foreman is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus and denial of the motion to stay.

## I.

## BACKGROUND

On June 5, 2019, Petitioner was convicted by a jury in the Kern County Superior Court of first-degree murder. (6 CT[1] 1677.) On July 10, 2019, Petitioner was sentenced to an imprisonment term of twenty-five years to life. (Id.) On February 24, 2022, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Foreman, No. F079645, 2022 WL 558250, at *31 (Cal. Ct. App. Feb. 24, 2022). On May 11, 2022, the California Supreme Court denied Petitioner's petition for review. (LD[2] 14.)

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 15.)
[2] "LD" refers to the documents lodged by Respondent. (ECF No. 15.)

On March 10, 2023, Petitioner filed the instant federal petition for writ of habeas corpus, raising the following claims for relief: (1) erroneous exclusion of third-party culpability evidence; (2) erroneous denial of continuance; (3) erroneous admission of expert testimony; (4) erroneous admission of DNA testimony; (5) erroneous admission of hearsay evidence; (6) unlawful conviction under the felony-murder theory; and (7) cumulative error. (ECF No. 1 at 4–6.)[3] Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 17, 23.) In the traverse, Petitioner also requested to stay the instant proceedings pending the outcome of his motion for DNA testing in state court. (ECF No. 23 at 14–16.)

## II.

## STATEMENT OF FACTS[4]

The victim, 18-year-old Dawn Koons, moved to Bakersfield from New York in the fall of 1978. She came to Bakersfield after her high school sweetheart, S.,[5] had moved there several months before. When she first arrived, Dawn lived with S., but their relationship ended after only a few weeks and she moved out into her own apartment.

Around 6:15 p.m. on Tuesday, January 16, 1979,[6] Bakersfield police officers entered Dawn's apartment and found her dead inside the bathroom. There were no signs of forced entry. Dawn's nude body was in the bathtub with her hands tied behind her back and a pillowcase covering her head. There was also a ligature around her neck. The wrist and neck ligatures were telephone cords cut from Dawn's apartment telephone. Her body lay in the bathtub with her head under the faucet, and her legs were splayed widely open, exposing her vagina. Her apartment looked "lived in," but not messy or in disarray. However, the bed sheets were "very rumpled," and part of the mattress was exposed. One of her bed pillows was missing its pillowcase.

Dawn's "best friend," Diane D., testified about Dawn's activities in the days before she was found dead. Diane D. and Dawn worked together at a local restaurant. Diane D. said she last saw Dawn on Friday night, January 12. In the afternoon on Friday, January 12, Diane D. picked Dawn up from her apartment to go to work. While inside the apartment, Diane D. noticed Dawn's bed was not messed up. Diane D. explained Dawn kept her apartment "spotless." Diane D. and Dawn worked their shift and got off around 8 p.m., after which the two went to a restaurant. Diane D. said Dawn had French fries and may have had a glass of wine. After they left the restaurant, Diane D. dropped Dawn off at her apartment around 10 or 10:30 p.m. and watched her walk inside.

---

[3] Page numbers refer to the ECF page numbers stamped at the top of the page.
[4] The Court relies on the California Court of Appeal's February 24, 2022 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[5] Pursuant to California Rules of Court, rule 8.90, we refer to this witness using his first initial only to protect his identity. We will also abbreviate or use initials for the rest of the witnesses who are not law enforcement or expert witnesses.
[6] References to dates are to dates in 1979 unless otherwise stated.

1

2       Diane D. and Dawn had plans to go horseback riding the next morning. However,
        Dawn did not answer the phone and did not come to her door that morning when
3       Diane D. knocked. Diane D. tried looking into Dawn's apartment but the curtains
        were shut. Dawn did not show up for work on Saturday or Sunday.[7] Diane D.
4       continued trying to contact Dawn by phone and knocking on her door, and left a
        note on Dawn's door, "probably" on Sunday, asking Dawn to call her.[8]

5       Diane D. testified about a Black man who had been following Dawn and
        "creeping her out."[9] Diane D. testified she and Dawn would see the man in
6       various places in the apartment complex; the man "seemed to show up wherever
        [they] were." Dawn told Diane D. the man was creeping her out and following her
7       around. Diane D. felt the man was following Dawn, not Diane D., because of the
        way the man would look at Dawn. Diane D. stated that one time she and Dawn
8       were in the apartment clubroom when he came in, and they left.

9       The prosecutor asked Diane D. if she recognized Foreman in court. Diane D.
        initially said, "I can't see where he's at the present time." Foreman then waved
10      at Diane D.. Diane D. then said, "I'm legally blind in my left eye now, but I
        wasn't back then. That's why I couldn't see him." She then said, "I'm pretty sure
11      that's him."

12      Diane D. was extensively cross-examined about her prior police statements (in
        1979, 2012, and 2017) as to whether Dawn had said anyone had been harassing
13      her. Diane D. first testified she could not recall what she told police. Then, after
        reviewing police reports, she claimed the police had inaccurately documented her
14      statements. She eventually acknowledged that in 1979 and 2012 she did not
        mention the race of the man who had been harassing Dawn. She testified,
15      however, that she called police in 2017 after seeing Foreman on television and
        realizing he was the person who had been bothering Dawn. She also testified on
16      cross-examination that she recalled being introduced to Foreman by another man
        in the clubroom of Dawn's apartment complex in 1978 or 1979. He was
17      introduced to her with a one-syllable name that she could not remember. Diane D.
        denied that she would have said anything about Dawn being harassed by her ex-
18      boyfriend.

19      On redirect, Diane D. testified for the first time that she saw Foreman as she
        dropped Dawn off on Friday night, January 16. She stated her car headlights
20      swept across him as she pulled in. On recross-examination, she said she did not
        know if she told police this, but stated it seemed to her that she would have. But
21      pressed further, she admitted she did not tell this to police in 1979.

22      The defense called the detective who interviewed Diane D. in 2017. Diane D. told
        the detective Dawn had introduced her to a Black man at the apartment complex
23      who Diane D. thought was "nice." Diane D. told the detective she thought Dawn's
        "ex-boyfriend" might have been the man who had been creeping her out. Diane
24      D. specifically said to police, "There was some guy creeping her out. I don't—she
        didn't—I—I'm thinking it was, like, her ex-boyfriend or something."

25

26

27      [7] Diane D. remembered she and Dawn were scheduled to work a shift together that weekend, but she could not
        remember whether it was Saturday or Sunday. In any event, Dawn did not show up either day.
        [8] Diane D. "think[s]" it was Sunday that she left the note.
28      [9] Foreman is Black.

3

Dawn's ex-boyfriend, S., also testified for the prosecution. He testified he and Dawn were high school sweethearts. He moved to Bakersfield in the summer of 1978, and Dawn followed him in the fall. The two lived together for a few weeks before they broke up and Dawn moved out. S. said he "made sure she got to a nice apartment," and he gave her everything he could to "get her started."

S. described his "communications" with Dawn after their breakup as "cordial" "most of the time." They would telephone each other from time to time to see how the other was doing. He stated they would each hang up on each other sometimes in the middle of calls.

S. testified Dawn told him a Black man was harassing her at the mailboxes at her new apartment. According to S., Dawn said the Black man told her he wanted to "fuck" her, which upset her. S. said Dawn called him at one point and said the Black man was in her apartment and would not leave. S. told Dawn to call police. Dawn responded, "Call the police?" And S. heard a male voice say, "Oh, no. No, not the police." S. said the man then apparently left. S. testified Dawn had a habit of leaving the door unlocked, and he said he told Dawn to lock her door. He knew about this habit because there were a couple of occasions where he arrived at her apartment, knocked on the door, turned the doorknob and the door opened. He explained she was not used to locking her door because in New York she lived on the sixth floor of an apartment building with a locked lobby.

S. testified that, on another occasion less than a week after the phone call when the man was in Dawn's apartment, he was over at Dawn's apartment when she went out to get her mail. S. said she came back and was "shook up" because she said the Black man was there and had really scared her. Dawn said, "You know that guy I was telling you about? He's out there right now. That man really scares me." S. testified he looked out the window and saw the man. S. identified Foreman in court as the man he saw out of the window. Asked how S. knew Foreman was the man he saw all those years ago, S. stated, "Because I can still see his face when he was 21 years old."[10]

S. said he saw Foreman one other time when he pulled into the parking lot of the apartment complex. Foreman was outside near the mailboxes, staring at Dawn's apartment. S. entered Dawn's apartment and said, "He's out there." S. looked through the window blinds and waited for Foreman to leave, but Foreman continued to stand there, staring. Foreman then started walking away and went a little out of sight. S. went outside to see where Foreman was going. S. watched Foreman as he walked into apartment 50, which was behind and upstairs from Dawn's apartment.

S. stated he spoke with police in 1979 and told them about the Black man in apartment 50 who had been harassing Dawn at the mailboxes and who had been inside of Dawn's apartment without permission. S. said he gave this information to Detective Louis Bayus the day after Dawn's body was discovered. He also told police that Dawn once told him that the man came to her door at 2 or 3 a.m. She heard knocking, looked out, and realized it was the man from apartment 50. She identified him to S. as "Apartment 50." She had some words with the man through the door and he told her he wanted to come in. He said something like, "I want to fuck you. I can give you what you need. You're lonely."

---

[10] It is unclear how S. would have known Foreman's age.

4

Defense counsel questioned S. about a different statement he made to police in 2015. The parties stipulated S. told police that in 2015 that, as to the Black man who was allegedly harassing Dawn, S. did not find out where the man lived until after Dawn's death. S. denied that he made this statement.

The prosecutor also questioned S. about his whereabouts on the weekend of Dawn's murder. S. testified he was with friends in Bakersfield on Friday evening, January 12. He was at the home of a couple named Michael B. and Claudia G., and several other people were there also, including his friend Nanette M.. Michael B. and Claudia G. picked him up and brought him to their house, and he got home that night at 4:30 a.m.[11] The next morning, his roommate took him to pick up his motorcycle from the repair shop. He then began preparing to go away to the Greenhorn Mountain area for the rest of the weekend. He remembered Michael B., Claudia G., and Nanette M. were with him on that weekend trip but could not remember anyone else who was there. He returned late in the day on Sunday.

S. testified he last saw Dawn about two weeks before her death at her apartment. On cross-examination, S. initially said he did not remember any details of his last visit with Dawn. After having his memory refreshed with his 1979 police interview, he remembered there was an incident between the two of them on that occasion involving a pillow. He explained, "[I]t wasn't really a disagreement, but I was trying to help her, and I guess she wasn't showing appreciation, not in the form of sex, just appreciation." He stated he told Dawn she did not appreciate everything he did for her, including giving her a certain pillow. He picked up the pillow and then "left like a little kid with [his] pillow." S. acknowledged that the report stated there was a "scuffle" over a pillow but said there was no scuffle.

S. acknowledged the police report of his 1979 interview stated he told police he had a key to Dawn's apartment for a few days. However, he testified that was incorrect. He stated he may have had a key for a day to help drop some things off at her apartment, but never had a key for an extended period "to come and go [from] her apartment." S. acknowledged he told police several times he was "glad that [he'd] been away at the time," because, "I was the boyfriend; so, logically, I was the most likely suspect."

S. also testified about an incident with Foreman that occurred after Dawn's death. S. stated he finished having dinner with his roommate Robert B., and Robert B.'s girlfriend at the girlfriend's house and was walking down the street to his car. He stated his roommate and the girlfriend were standing on the terrace outside as he was leaving. When he got to his car, he saw a white car across the street with the engine running but without the lights on. As he opened his car door, the other car turned on it lights and "came across the road at [him]," forcing S. to leap onto his car's roof. S. testified he "yelled" to his friends to call 911. He said his friends did not hear him, so he drove after the car. However, he admitted he told the police in 1979 that his friends acknowledged what he said about calling police before he drove after the car.

S. said the white car had a "very large motor" because it took a few blocks to catch up to it and he could hear the motor "screaming" down the road. S. said he caught up to the car at a traffic light and saw Foreman was the driver. The two looked straight at each other and S. noticed Foreman had shaved his head. He followed Foreman and watched him pull into Dawn's apartment complex, which

---

[11] While S. Did not recall the last names of Michael, Claudia, and Nanette, their last names came out later during the trial.

was about one or two miles away from where S. had been having dinner and may have been on the same street. Foreman drove into a parking space at the complex. S. drove to a nearby gas station and called Detective Bayus and told him that the man who had been harassing Dawn had just tried to run him over. S. testified Bayus told him the Black man in apartment 50 had given an alibi—he was with his girlfriend at the time of the murder. Asked how he remembered this event so well, S. explained it was a traumatizing experience and that his "life was on the line" in that he was Dawn's boyfriend and therefore "the most likely suspect" in her death. He stated law enforcement "weren't exactly easy on [him]."

On redirect, the prosecutor concluded S.'s examination by showing him a picture of Dawn's body and asking him if he had anything to do with her death. S. cried and said no.

The prosecution next called three witnesses to testify regarding S.'s whereabouts from Friday, January 12, through that weekend. Nanette M. testified that she was with S. on Friday, January 12, at a friend's house. Two other friends named Michael B. and Claudia G. were also there. Nanette M. testified she drove S. to the friend's house but did not drive him home. She testified she then went with S., Michael B., and Claudia G. to the mountains the next day. They left in the early afternoon on Saturday and returned Sunday early evening.

Michael B. testified he remembered being at his house with S. and Nanette M. on an evening in 1979, but he could not remember the date and did not remember giving S. a ride. He said the people at his house were drinking.

Robert B., S.'s roommate, testified he vaguely remembered talking to police about S.'s whereabouts on the weekend of the murder. He said his brain around that time was "pretty fickle" because he drank a lot then. He said he told police that Nanette M. picked S. up on Friday and he "wasn't exactly sure what time [S.] had gotten home that morning," but it was "like around 2:00 or 3:00 a.m." The next day, Robert B. took S. to get his motorcycle and S. then left town.

***Forensic pathology testimony***

Dawn's autopsy was performed on Wednesday, January 17. However, the doctor who performed the autopsy died before trial. The prosecution called a substitute pathologist, Dr. Eugene Carpenter, to testify about the autopsy report and photos.

Dr. Carpenter explained Dawn was found with both wrists tied "very tightly" behind her back and a loose ligature around her neck. He stated the tight tying of the wrists was "clearly consistent with an aggressive act." There was a pillowcase covering her head with signs of moisture on it. Moisture and bloody mucous were coming out of Dawn's nose and running down her face. There were bruises and abrasions on her chest, arms, and legs, but Carpenter said he could not determine how old these injuries were. Carpenter said the cause of death was asphyxia, likely from suffocation. Dawn's blood alcohol content at the time of autopsy was .037, and there was vegetable-like material in her stomach.

Carpenter stated it is difficult to determine time of death in this case based on post-mortem evidence from the body. Carpenter described Dawn's body as showing mild to moderate signs of decomposition, and he noted the original pathologist described the decomposition as moderate. Carpenter stated that if Dawn's body were kept shaded and at 70 degrees, the state of decomposition would indicate she had been dead for at least 36 to 48 hours. However, the rate of

decomposition would be slowed if her body were in a colder environment. In a colder environment, her body would not reach the state of decomposition it was found in until much longer than 36 to 48 hours.

Carpenter further testified that the best evidence as to time of death is when a decedent's normal routine was disrupted. Based on the evidence from Diane D. as to Dawn not showing up for a planned outing, plus the alcohol found in Dawn's blood, Carpenter opined that the time of death was late on Friday, January 12, or early on Saturday, January 13. He also stated that "the degree of decomposition of the body alone, without considering the alcohol, without considering the disruption of daily routine, puts the time of death easily several days prior to the body being found."

Carpenter said there were no injuries suggesting sexual assault, although he said such injuries are rare. He said sometimes a sexual assault leaves bruises from the perpetrator grabbing the thighs, but there were no such bruises here. He said the original pathologist looked for but did not find defensive injuries, but Carpenter said that finding was not significant. Carpenter said it "overwhelmingly ... look[ed] like" the homicide had a sexual component because Dawn was found naked in the bathtub with her hands tied behind her back.

***DNA evidence***

In 2010, the Bakersfield Police Department's cold case unit began reviewing the materials from the original investigation. In 2011, a detective retrieved the rape kit (which included two vaginal slides), phone cords from Dawn's wrist and neck, and other items from the property unit.

In 2015, detectives obtained a different set of materials from the coroner's office. The coroner's materials included two microscopic slides. The coroner's office had found the slides approximately a year before detectives asked for materials in this case, in a banker's box of loose slides from many cases.[12] The box contained mainly histology slides, but the two slides for Dawn's case were not histology slides. The two slides for Dawn's case had handwriting on them. No witness was called to testify as to the collection of the slides, when or how the slides were put in the box, how the box was stored, or when or by whom the writing was placed on the slides. However, one of the slides had handwritten on it the name "Koons," the word "vag," and the number "C-051-79," which was the coroner's office number for this case. The other slide had less legible writing, but the letters "K-o-o" and the partial case number "C-05" were legible.

Detectives submitted the rape kit and the coroner's slides to the Kern Regional Crime Laboratory for DNA testing. The prosecution called a DNA analyst, Garrett Sugimoto, who testified about the DNA testing performed on the rape kit slides received from the Bakersfield Police Department as well as the slides from the coroner's office. He stated his office received four slides, two from the rape kit and two from the coroner's office. The rape kit slides were received in 2012 and the coroner's slides were received in 2015.

DNA testing on one of the rape kit slides was performed in 2013. He reported the results in 2017 and saw there was a sperm cell fraction and a nonsperm cell

---

[12] The fact that the slides were found about a year before the police department's query was testified to at the Evidence Code section 402 hearing on the admissibility of this evidence, but the jury did not hear this fact. However, this testimony was not contradicted at the trial.

fraction of DNA. However, only very low-level profiles of both fractions could be generated. Testing on the other rape kit slide and the two 2015 coroner's slides was performed in 2017. Since the first rape kit slide produced such a low-level profile, Sugimoto decided to swab each of the three remaining slides (the second rape kit slide and both coroner's office slides) and then place the three swabs into the same test tube, with hope that a higher-level profile could be generated.

From the swabs of these three slides, Sugimoto was able to develop DNA profiles for both the sperm cell fraction and the nonsperm cell fraction. The nonsperm cell fraction contained only a single DNA profile and was interpreted as a partial profile, from which Dawn could not be excluded as a potential contributor. The sperm cell fraction contained a mixture with a major contributor and a minor contributor, with approximately 90 percent of the fraction coming from the major contributor. Dawn could not be excluded as the potential minor contributor to that profile either. The major contributor profile was uploaded to the Combined DNA Index System (CODIS), a nationwide DNA database. On October 19, 2017, the lab received a "hit letter" from the California Department of Justice stating that Prentice Foreman was the potential major contributor to the submitted profile. Sugimoto further testified that the laboratory received a buccal swab from Foreman in December 2017 and used it to run a confirmation test.[13] In the confirmation test, the DNA profile from Foreman's known buccal swab matched the profile from the combination swab. Sugimoto stated the probability of selecting somebody randomly from the African American population group that would have the DNA profile detected in the major portion of the sperm cell fraction was one in 8.3 quintillion. One quintillion can be written in algebraic notation as a 1 followed by 18 zeros. Sugimoto testified the DNA analysis of the cords used to bind Dawn's neck and wrists was inconclusive.

The defense called its own DNA analyst, Thomas Fedor, who agreed with Sugimoto that the DNA from the sperm fraction of the vaginal slides belonged to Foreman. As to the non-sperm fraction, Fedor testified that there was male DNA present, which excluded Foreman but did not exclude S.. This male DNA from the non-sperm fraction, however, could have belonged to "almost anyone."

Fedor also testified that, to gain more information from the DNA data, he lowered the threshold for analysis below the threshold the Kern Crime Laboratory used. Using the lowered thresholds, he concluded DNA on the neck and wrist ligature did not belong to Foreman or Dawn.

### Expert testimony as to when sperm deposited

The prosecution presented testimony from Carol Williams, an evidence technician at the Kern Regional Crime Laboratory, as to when the sperm in the vaginal slides was deposited. Williams testified she photographed small snippets of the slides, and then examined the snippets to determine approximately how many sperm cells were present, and how many sperm with tails. Williams stated there were "very many" sperm cells, and numerous sperm with either partial tails or midpieces, which, according to Williams, are seen in fresher samples.

Williams testified the sperm were deposited within 48 hours of death. She acknowledged sperm can survive in a living victim for four to five days, and that studies have shown the possibility of finding sperm as long as 96 hours in living

---

[13] As we will restate later, this swab was taken from Foreman when he was arrested on December 20, 2017.

victims. However, she said those situations involve finding perhaps "single sperm cells or few sperm cells" after that much time, not the quantities present here.

The defense's DNA expert, Thomas Fedor, also addressed the question of how long before death the sperm were deposited. Fedor stated no expert could give an opinion based on this evidence that the sperm were deposited within any particular time frame. He said he had reviewed thousands of samples with sperm, and that the amount of sperm and the presence of tails are not significant in determining when the sperm were deposited.

### *Expert testimony as to whether the homicide was sexually motivated*

Over a defense objection, the prosecution called an expert witness, Dr. Gregory Saathoff, to offer an opinion as to whether the homicide had a sexual component. Dr. Saathoff is a psychiatrist with many years of experience. Over the past 27 years, part of his employment was as a men's prison psychiatrist, and in that position he had assessed and treated more than 2,000 individuals categorizable as sexually violent predators. He also served as a consultant and a teacher at the Federal Bureau of Investigation Academy in Virginia. He had seen photographs of hundreds of violent crime scenes involving crimes with a sexual component.

Saathoff testified the homicide in this case included a "nonconsensual sexual assault," and described six factors that "strongly pointed to nonconsensual sex being a part of this homicide rather than consensual sex." These six factors could be summarized as follows: (1) Dawn's nudity; (2) the disarray of the bedsheets; (3) the cut telephone cords used to bind Dawn; (4) the placement of the pillowcase over Dawn's head; (5) the unusual placement of Dawn's nude body in the bathtub; and (6) the posing of her legs in a splayed manner with her vagina exposed.

Saathoff explained how nudity is arousing and makes the victim feel vulnerable. He also explained that many perpetrators of sexually motivated homicides will retain very strong images in their minds of their victims, and if a nude condition is more arousing to them, they can summon those images in their minds of their victims' nudity at future times and become aroused again.

Saathoff also noted from the crime scene photographs the rumpling of Dawn's bedsheets and that one of the pillows was missing its pillowcase that was found over Dawn's head. He stated the "significant disruption" of Dawn's bedding indicated "significant activity" which in turn suggested there may have been a struggle on the bed in addition to sexual activity. He also stated the cutting of the telephone cords accomplished two crucial things: it eliminated a means of Dawn calling for help and supplied the material for binding her.

Saathoff further discussed how the pillowcase over the head objectifies the victim, as well as provides an additional means of reducing the victim's capacity to resist or escape. Moreover, the dark and wet stains on the pillowcase suggest a significant amount of activity and resistance from Dawn. Some victims who have a pillow placed over their head will attempt to bite the perpetrator, which would explain why the pillowcase here would have been taken into Dawn's mouth.

Regarding Dawn's positioning in the bathtub with her head underneath the faucet, Saathoff stated it is hard to conceive that a person would choose to place themselves in a bathtub that way, which suggests Dawn was placed there by someone else. Additionally, Saathoff noted that Dawn's legs were spread wide in

a manner that would allow the person who would come upon the scene to see her vagina "prominently." He explained this is one of the most sexualized ways a woman could be displayed or "posed." He also explained that the pillowcase over her head would direct one's attention to the victim's vagina, which, again, is a very sexualized way to leave a victim. He stated that the particular posing of Dawn's body could have been part of the perpetrator's fantasy and could have helped them remember Dawn in a very graphic, sexualized manner. He also described the posing of Dawn, with a pillowcase over her head and her legs spread open, as "very disrespectful" and "degrading." He stated that without her face showing, "the victim as an individual is just really obscured," and it does not "engender as much sympathy to see the victim in this way."

Saathoff concluded: "Based upon assessments, evaluations, and the reports of sexual predators who talk about the way that they left their victim, one, to leave someone in a degrading position is, in essence, to degrade them and that they deserve to be degraded. And so in such a position, it's not uncommon for the individual and his feelings about the victim or his lack of feeling about the victim to want others to see the victim in the same way that he saw the victim and have a similar feeling about this person as an object, as having little worth."

Saathoff also said the circumstances "strongly suggest[ ] that the sexual activity was soon followed by the homicide and that the two were related. In other words, there was a merging of the sexual assault then into the homicide[.]" He also stated the time between the sexual intercourse and the homicide "was fairly short." He said there was "direct linkage between the sexual activity ... and the murder," and "the sex and the murder are tied together."

Saathoff rejected the possibility Dawn had consensual sex before she was murdered. He testified there was only one reasonable interpretation of the evidence he had reviewed: "Nonconsensual sexual assault prior to death." When asked if it was possible Dawn was murdered by someone other than the person who had sex with her, Saathoff said, "It's not reasonable that someone else did it."

***Foreman's statements to police***

Homicide detectives Louis Bayus and Les Vincent interviewed Foreman on January 31, about two weeks after Dawn's body was found. The lead detective, Bayus, died before trial, but Vincent was still alive and testified. Vincent stated he and Bayus had information that Foreman may have been harassing Dawn, which was the reason he and Bayus went to interview Foreman. Vincent did not know who had claimed Foreman had been harassing Dawn. Vincent said Foreman stated that he would say hello to Dawn, but that he did not know her well and had never been in her apartment.

The prosecution called L.C. to testify about whether Foreman was with her around the time of Dawn's death. L.C. said she had known Foreman when she was a teenager because their mothers lived near each other. She said she had never dated him or socialized with him. She said she sold him a white 1970 Pontiac GTO probably in 1977. She said she believed she was in school in Texas for the entire month of January 1979. She testified she was not absolutely sure of this, though she agreed she had said she was absolutely sure of this at her preliminary hearing, and she said her preliminary hearing testimony was true. She stated the college she was attending was on a semester schedule with a winter break during which she would have come home.

The prosecution also called S.F., who lived with Foreman in apartment 50 at the time of the murder. At the time, S.F. and Foreman had one child and were expecting a second. S.F. testified she did not remember where she or Foreman was from January 12—16, 1979. She said she did not know when Dawn was murdered. S.F. stated Foreman would sometimes be gone on the weekends, but she did not remember where he was on any specific weekend in 1979.

S.F. stated she was home when police came to the apartment to interview Foreman in 1979. She said she did not hear the conversation, but Foreman told her police were asking questions about the murder. S.F. said Foreman never shaved his head during the period she was living with him.

The prosecution also played three recorded conversations between Foreman and police that took place in 2017. The first two conversations were phone calls that occurred before Foreman was arrested for the murder. In the first call, Foreman told the detective he and Dawn were acquaintances. He repeatedly said he had not known anything about Dawn's death in 1979 and did not know anything about it now. Asked if he could help police get in touch with L.C., Foreman said no, and, "I was never with no [L.C.]." In the second phone call, Foreman told the officer not to call him anymore unless the detective wanted him to report to a jail cell.

The prosecution also played a recording of Foreman's videotaped interrogation after he was arrested for the murder. Foreman was arrested and interviewed on December 20, 2017, which was after the Kern Regional Crime Laboratory had received notice that the DNA profile generated from Dawn's vaginal slides had returned a match in CODIS to Foreman. In the interview, Foreman denied raping or murdering Dawn. He said he and Dawn were friends and had one consensual encounter inside Dawn's apartment. Asked when the sexual encounter occurred, he initially said, "I don't know. I don't remember." He said he could not estimate the month. Later, pressed on his connection to Dawn, he said the sexual encounter was months before the murder. Foreman denied telling police in 1979 that he was with L.C. during the time Dawn was murdered. He said he was with the mother of his children, S.J..[14] He said he bought his car from L.C., a white Pontiac GTO. He also denied saying in 1979 that he had never been inside Dawn's apartment. A crime scene technician also took a buccal swab of Foreman's cheek that day.

Finally, the prosecution played a jail call between Foreman and an unidentified female friend from 2017. During the call, Foreman said the prosecutor, judge, and public defender were lying about finding his DNA on Dawn. He stated his DNA would not have been at the crime scene. He said the judge and public defender were working with the prosecutor.

Foreman, 2022 WL 558250, at *1–10 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

---

[14] S.F. is the same person as S.J., but she had a different last name in January 1979.

1   or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

2   529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed

3   by the United States Constitution. The challenged conviction arises out of the Kern County

4   Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a);

5   28 U.S.C. § 2241(d).

6       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

7   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

8   enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

9   Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is

10  therefore governed by its provisions.

11      Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred

12  unless a petitioner can show that the state court's adjudication of his claim:

13  (1) resulted in a decision that was contrary to, or involved an
14  unreasonable application of, clearly established Federal law, as
    determined by the Supreme Court of the United States; or

15  (2) resulted in a decision that was based on an unreasonable
16  determination of the facts in light of the evidence presented in the
    State court proceeding.

17  28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562

18  U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been

19  "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala,

20  576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is

21  reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009).

22      In ascertaining what is "clearly established Federal law," this Court must look to the

23  "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

24  relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

25  decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that

26  'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent

27  decisions"; otherwise, there is no clearly established Federal law for purposes of review under

28  AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742,

754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. Generally, federal courts "look through" unexplained decisions and review "the last related state-court decision that does provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

1    "When a federal claim has been presented to a state court[,] the state court has denied

2    relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

3    the state court adjudicated the claim on the merits in the absence of any indication or state-law

4    procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. Where the state court reaches a

5    decision on the merits and there is no reasoned lower-court opinion, a federal court

6    independently reviews the record to determine whether habeas corpus relief is available under

7    § 2254(d). <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the

8    record is not *de novo* review of the constitutional issue, but rather, the only method by which we

9    can determine whether a silent state court decision is objectively unreasonable." <u>Himes v.</u>

10   <u>Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

11   record and "must determine what arguments or theories . . . could have supported, the state

12   court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

13   those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

14   Court." <u>Richter</u>, 562 U.S. at 102.

**IV.**

**DISCUSSION**

**A.  Third Party Culpability**

18   In his first claim for relief, Petitioner asserts that he was denied a fair trial and denied his

19   right to present a complete defense due to the trial court's exclusion of third-party culpability

20   evidence, which also precluded impeachment of the primary alternative suspect. (ECF No. 1 at 4,

21   27–32.) Respondent argues that the state court reasonably denied Petitioner's third-party

22   culpability related claims. (ECF No. 17 at 16.) This claim was raised on direct appeal in the

23   California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned

24   decision. The claim was also raised in the petition for review, which the California Supreme

25   Court summarily denied. As federal courts "look through" summary denials and review "the last

26   related state-court decision that does provide a relevant rationale," <u>Wilson</u>, 138 S. Ct. at 1192,

27   this Court will examine the decision of the California Court of Appeal.

28   *///*

In denying Petitioner's third-party culpability claim, the California Court of Appeal stated:

### I. Exclusion of third-party culpability evidence

Foreman first contends his conviction must be reversed because the superior court erred in excluding third-party culpability evidence showing that S. killed Dawn. Alternatively, he contends that some of the excluded evidence should have been admitted to impeach S.. We disagree. None of the proffered third-party culpability evidence linked S. to the actual perpetration of the crime and was thus inadmissible to show S.'s culpability. Additionally, some of the proffered evidence was only at best marginally relevant for impeachment purposes, and thus the court did not abuse its discretion in excluding it for those purposes as well.

### A. Relevant legal standards

In the seminal case of *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*), our Supreme Court clarified the rules for the admission of third-party culpability evidence, stating: "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*Id.* at p. 833.) Courts evaluating culpability must first determine whether the evidence "could raise a reasonable doubt as to defendant's guilt" and then consider its admissibility under Evidence Code section 352. (*Ibid.*) In other words, "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*Hall*, at p. 834.) "[A]n inquiry into the admissibility of such evidence and the balancing required under [Evidence Code] section 352 will always turn on the facts of the case." (*Hall*, at p. 334.)

The *Hall* court emphasized that "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra*, 41 Cal.3d at p. 833; see *People v. DePriest* (2007) 42 Cal.4th 1, 43 (*DePriest*) ["Under *Hall* and its progeny, third party culpability evidence is relevant and admissible only if it succeeds in 'linking the third person to the actual perpetration of the crime.' "]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1018 (*Edelbacher*) ["evidence of a third party's motive, without more, is inadmissible"].)

Numerous courts have applied the Hall rubric to reject tenuous third-party culpability claims. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1239, 1242 (*Prince*) [evidence that victim had told six acquaintances that her boyfriend struck her, threatened her with a knife, and that they had "furious arguments" properly excluded because the evidence "did not directly or circumstantially connect [the boyfriend] to the actual commission of the crimes," showing "no more than motive"]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1135—1137 [while evidence linking victim to drug trafficking might indicate that a third party involved in drug trafficking "had a motive or possible opportunity" to murder the victim, "additional direct or circumstantial evidence was required to link ... some other third party to the actual perpetration of the crime"]; *People v. Lewis* (2001) 26 Cal.4th 334, 373 [third-party culpability evidence excluded as speculative and

too remote in time and manner; the probative value of the evidence did not outweigh its prejudicial impact and possible confusion of the issues]; *People v. Kaurish* (1990) 52 Cal.3d 648, 684—686 [mere evidence of a third party's anger at the victim did nothing to link that third party to the actual perpetration of the crime as required by *Hall*]; *Edelbacher, supra*, 47 Cal.3d at pp. 1017—1018 [victim's involvement in drug dealing provided a possible motive only and was thus insufficient to raise a reasonable doubt as to defendant's guilt].)

Evidence Code section 780 provides another potential path to admissibility. It specifies that, in evaluating a witness's credibility, "the court or jury may consider ... any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] ... [¶] (e) His character for honesty or veracity or their opposites. [¶] (f) The existence or nonexistence of a bias, interest, or other motive." For example, "[p]roof of a witness' bias or prejudice against the specific individual who is a party in the litigation is clearly admissible." (*In re Anthony P.* (1985) 167 Cal.App.3d 502, 508.) However, Evidence Code section 780 "does not 'say that all evidence of a collateral nature offered to attack the credibility of a witness would be admissible. Under [Evidence Code] section 352, the court has substantial discretion to exclude collateral evidence.' " (*People v. Thornton* (2007) 41 Cal.4th 391, 428.) We review the relevant facts under the foregoing principles.

## B. Factual context

In pretrial proceedings, the defense more than once moved the court to permit evidence suggesting S. committed the murder. Police investigators, the prosecutor, and S. himself acknowledged S. was a suspect in the case earlier on. Dawn moved to Bakersfield to be with S., but the relationship soon ended, and Dawn moved out and was murdered about a month later.

The defense sought to prove S. was an abusive and possessive ex-boyfriend who had threatened to harm Dawn if she became romantically involved with anyone else. In that vein, the defense sought to introduce evidence that Dawn did become sexually involved with other people before her death—namely Foreman and another man named John M.—and that S. may have come to know this due to his following Dawn around. Ultimately, the defense wanted to introduce evidentiary support for its theory that Dawn and Foreman had sex in the days before her death and S. killed Dawn out of jealousy.

The defense proffered 12 statements from various persons which we will number for convenience. (1) A person named Sonja R. spoke with police in 1979 and stated she saw S. hit Dawn after their break-up in the three-to-four-week period before the murder. (2) Dawn's mother also told police she had seen S. hit Dawn while the two were still living in New York.

The defense also proffered statements from two witnesses who told police that Dawn had described to them S.'s possessive and threatening behavior. (3) Diane D. stated Dawn told her during the two weeks before her murder that she was afraid of S.. (4) John K. told police that Dawn told him she had broken up with her boyfriend because he was being possessive and following her around. According to John K., around New Year's Dawn said her boyfriend had threatened to "bust her" if he caught her with anyone else. (5) Additionally, Nanette M. told police in 2012 she believed S. had committed the murder and

16

thought she remembered S. talking hypothetically about wanting to push Dawn out of an airplane.

The defense also proffered that, during the period in which S. threatened Dawn not to become sexually involved with another man, Dawn had become sexually involved with John M.. (6) John M. told police that he had three sexual encounters with Dawn at her apartment between January 2 and January 12 and that he was with Dawn for much of the day on January 12.[15] John M. said S. would call Dawn and she would answer and say, "Fuck you," before hanging up.

As an additional aspect of the third-party culpability argument, the defense sought to introduce (7) a statement from Dawn's mother that Dawn typically slept naked. The defense argued this evidence was relevant to show that the person who killed Dawn may not have sexually assaulted her; anticipating the prosecution's argument that Dawn's killer must have removed her clothes to sexually assault her, the defense sought to show that Dawn may have been naked before the killer arrived because she usually slept naked.

Furthermore, the defense sought to present a host of evidence that S. was dishonest and therefore his statements to police—establishing his innocence and implicating Foreman—could not be trusted. The defense proffered (8) a statement from Dawn's mother that S. was a "liar" and a "BS artist," and (9) a statement from Dawn's brother that S. was a liar. (10) Also, S.'s ex-wife stated S. lied to his new wife about the ex-wife's supposed infidelity. Finally, the defense proffered (11) a statement Bayus made to Dawn's mother that S. made untrue statements to police, and (12) a statement from Dawn's apartment building manager that Dawn had not complained about a Black man harassing her.

The trial court ruled before trial that none of this proffered evidence was admissible either as third-party culpability evidence or as impeachment evidence. The court ruled the evidence was "totally irrelevant" under a third-party culpability theory because none of it was connected closely in time to the murder and because none of the evidence linked S. to the actual perpetration of the crime. The court also ruled much of the evidence was inadmissible hearsay.

The issue resurfaced during trial after S.'s testimony. The defense contended that the evidence elicited establishing S.'s alibi opened the door to the defense presenting third party culpability evidence implicating S.. The prosecutor stated she had to introduce evidence about S.'s whereabouts the weekend of January 12 to provide context for the police investigation but maintained there was still not any evidence linking S. to the actual perpetration of the murder. The court ultimately ruled the proffered evidence was irrelevant as third-party culpability evidence because of the lack of connection to the actual perpetration of the crime, inadmissible as character evidence, and inadmissible under Evidence Code section 352.

### C. No abuse of discretion

A trial court is given wide latitude as to whether to admit or exclude evidence, and the abuse of discretion standard is deferential to the trial court's determination. (See *People v. Peoples* (2016) 62 Cal.4th 718, 748 (*Peoples*).)

---

[15] John M. died before the trial.

As our detailed recitation of the relevant facts makes clear, the admissibility of each of the 12 items of proffered evidence was heavily litigated by the parties. We find no error in the trial court's conclusion that none of the evidence was admissible under either a third-party culpability theory or an impeachment theory. The trial court correctly recognized that none of the defense's offers of proof with respect to third-party culpability provided any evidence connecting S. to the actual perpetration of the murder. Under the circumstances, the proffered evidence at most provided a motive for S. to kill Dawn and thus did not meet the evidentiary threshold for admission as third-party culpability evidence. (See *Hall, supra,* 41 Cal.3d at p. 833; *DePriest, supra,* 42 Cal.4th at p. 43.) We are aware of the evidence presented to the jury regarding S.'s whereabouts around the time Dawn was killed, which showed S. had the opportunity to commit the murder in the predawn hours of Saturday, January 13, as well as sometime after he returned to town on the evening of Sunday, January 15. However, evidence of motive and opportunity are insufficient to support a third-party culpability theory absent evidence connecting the third party to the actual perpetration of the crime. Foreman argues the evidence that S. had a key to Dawn's apartment provides a link to the actual perpetration to the crime. This is incorrect. At most, the evidence of S.'s *maybe* possessing a key would provide an opportunity to commit the crime. There was no evidence any key, much less the key S. allegedly possessed, was used to enter Dawn's apartment when she was killed.

To the extent Foreman is suggesting that any of the evidence should have been admitted under Evidence Code section 780 as evidence that S.'s bias or motive to lie during his testimony was because he was actually Dawn's killer, he is essentially rearguing third-party culpability which, as we have just stated, the trial court properly rejected. At best, the evidence was marginally relevant to the issue of whether S. had a bias or motive to fabricate his statements to police and his trial testimony. But without any evidence of his alleged involvement in the crime, the trial court concluded under Evidence Code section 352 that the limited probative value of the proffered evidence was substantially outweighed by the probability its admission would have confused the issues, misled the jury, or necessitated undue consumption of time. We cannot find any abuse of discretion in the trial court's careful weighing of these factors.

Finally, Foreman's assertion the proffered evidence pertaining to S.'s dishonest character should have been admitted to impeach S.'s credibility through cross-examination and extrinsic evidence is misplaced. He contends the defense should have been allowed to rebut S.'s claim that the breakup was "cordial" with evidence of S.'s threatening and possessive behavior after the breakup. The problem with this contention is that it materially misconstrues S.'s testimony. S. did not testify the breakup was entirely cordial. Rather, he only testified that his and Dawn's "communications" were "cordial" "most of the time," and admitted that sometimes they would hang up on each other and admitted that the last time he saw Dawn there was an unhappy incident involving a pillow. Thus, Foreman, on this specific point, is arguing he should have been allowed to impeach testimony that S. did not give.

Additionally, on the issue of impeachment, Foreman contends the defense was entitled to present evidence of S.'s character for dishonesty under Evidence Code section 780, subdivision (e). That subdivision allows the court or jury to consider a witness's "character for honesty or veracity or their opposites" when determining his or her credibility. (Evid. Code, § 780, subd. (e).) Specifically, he contends the proffered statements of Dawn's mother, Dawn's brother, and S.'s ex-wife should have been admitted to prove S.'s dishonesty. However, Foreman

offers no basis for admissibility of any of this evidence. Dawn's mother was unavailable as a witness because she was deceased, and Dawn's brother was not subpoenaed for trial, which we will discuss in more depth below. And as for S.'s ex-wife, she would have been called to testify about a specific instance of S.'s conduct to prove a character trait of his, which is not allowed under Evidence Code section 787. That section reads: "Subject to Section 788 [dealing with attacking credibility with prior felony convictions], evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness." (Evid. Code, § 787, abrogation recognized in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

The trial court did not abuse its discretion in excluding any of the defense's proffered testimony relating to third party culpability or impeachment of S..

Foreman, 2022 WL 558250, at *10–13 (footnotes in original).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). However, a "defendant's right to present relevant evidence is not unlimited," and "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' *or* 'disproportionate to the purposes they are designed to serve.'" United States v. Scheffer, 523 U.S. 303, 308 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)). "Under this framework, the restriction of a defendant's evidence pursuant to an evidentiary rule is arbitrary when applying the rule serves no legitimate purpose in the case at hand." Jones v. Davis, 8 F.4th 1027, 1036 (9th Cir. 2021). "Exclusions of defense evidence may be arbitrary even when, 'under other circumstances, [the rule] might serve some valid state purpose.'" Id. (alteration in original) (quoting Chambers v. Mississippi, 410 U.S. 284, 300 (1973)). "And application of an evidentiary rule to preclude defense evidence, even when doing so 'legitimately serve[s]' a 'state's interest' in the case at hand, is disproportionate when it infringes excessively on a defendant's right to 'tell his own story.'" Jones, 8 F.4th at 1036 (alteration in original) (quoting Greene v. Lambert, 288 F.3d 1081, 1091 (9th Cir. 2002)). "A trial court therefore may, consistent with the Constitution, exclude defense evidence through the proper application of evidentiary rules that serve a valid purpose in a given

1  case, including when proposed evidence is 'only marginally relevant or poses an undue risk of

2  harassment, prejudice, or confusion of the issues.'" Jones, 8 F.4th at 1036 (quoting Holmes v.

3  South Carolina, 547 U.S. 319, 326–27 (2006)). The Supreme Court "[o]nly rarely ha[s] . . . held

4  that the right to present a complete defense was violated by the exclusion of defense evidence

5  under a state rule of evidence." Nevada v. Jackson, 569 U.S. 505, 509 (2013).

6        With respect to whether the evidence should have been admitted to establish third-party

7  culpability, the Ninth Circuit has "held that a trial court's exercise of discretion to exclude

8  evidence under a rule of evidence that requires balancing probative value against prejudice could

9  not be an unreasonable application of clearly established Supreme Court precedent, because the

10  Court has never addressed the question whether such a rule could violate a defendant's

11  constitutional rights." Robertson v. Pichon, 849 F.3d 1173, 1189 (9th Cir. 2017) (citing Moses v.

12  Payne, 555 F.3d 742, 758–59 (9th Cir. 2009)). See Smith v. Terhune, 82 F. App'x 185, 186 (9th

13  Cir. 2003) ("The Supreme Court has not articulated the specific set of circumstances under

14  which a criminal defendant must be permitted to introduce evidence of potential third-party

15  culpability."). Here, the trial court "ultimately ruled the proffered evidence was," *inter alia*,

16  "inadmissible under Evidence Code section 352," Foreman, 2022 WL 558250, at *12, which

17  requires balancing probative value against prejudice. See People v. Hall, 41 Cal. 3d 826, 834

18  (1986) ("[C]ourts should simply treat third-party culpability evidence like any other evidence: if

19  relevant it is admissible ([Cal. Evid. Code] § 350) unless its probative value is substantially

20  outweighed by the risk of undue delay, prejudice, or confusion ([Cal. Evid. Code] § 352).").

21        With respect to whether the proffered evidence should have been admitted for purposes

22  of impeaching S.'s credibility, the Supreme Court "has never held that the Confrontation Clause

23  entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes."

24  Jackson, 569 U.S. at 512 (emphasis omitted); id. at 511 ("The admission of extrinsic evidence of

25  specific instances of a witness' conduct to impeach the witness' credibility may confuse the jury,

26  unfairly embarrass the victim, surprise the prosecution, and unduly prolong the trial. No decision

27  of this Court clearly establishes that the exclusion of such evidence for such reasons in a

28  particular case violates the Constitution.").

1     Based on the foregoing, the Court finds that the state court's determination regarding

2   exclusion of the proffered evidence for purposes of third-party culpability or impeaching S.'s

3   credibility was not contrary to, or an unreasonable application of, clearly established federal law,

4   nor was it based on an unreasonable determination of fact. The decision was not "so lacking in

5   justification that there was an error well understood and comprehended in existing law beyond

6   any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is

7   not entitled to habeas relief on his first claim and it should be denied.

8       **B.  Inability to Secure the Victim's Brother's Appearance**

9     In his second claim for relief, Petitioner asserts that the trial court erred in denying a

10   continuance to allow the defense to secure the appearance of the victim's brother to testify at

11   trial. In the alternative, Petitioner asserts that trial counsel was ineffective for failing to secure

12   the victim's brother's appearance in a timely manner. (ECF No. 1 at 4, 32–34.) Respondent

13   contends that the state court reasonably rejected this claim. (ECF No. 17 at 23.) This claim was

14   raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied

15   the claim in a reasoned decision. The claim was also raised in the petition for review, which the

16   California Supreme Court summarily denied. As federal courts "look through" summary denials

17   and review "the last related state-court decision that does provide a relevant rationale," Wilson,

18   138 S. Ct. at 1192, this Court will examine the decision of the California Court of Appeal.

19     In denying this claim, the California Court of Appeal stated:

20   **II. Continuance to secure testimony of witness**

21   Foreman contends his conviction must be reversed because the trial court erred in
     denying a mid-trial continuance request for the defense to secure Dawn's
22   brother's appearance at trial as a witness, or, alternatively, because trial counsel
     was ineffective for failing to timely secure Dawn's brother's appearance. We
23   reject these arguments because Foreman has not demonstrated that the trial court
     erred in ruling Dawn's brother's testimony would be inadmissible. Thus, we need
24   not assess counsel's performance or the reasonableness of the length of the
     continuance.
25
       **A. Factual background**
26
     The jury was sworn on Thursday, May 9, 2019, and the parties made opening
27   statements on Monday, May 13, 2019. On May 24, 2019, the defense moved for a
     continuance to secure Dawn's brother's testimony. The defense's request for a
28   continuance was based on a 2011 phone call between Dawn's brother and a

Bakersfield police detective in which Dawn's brother called S. a liar. This approximately 20-minute phone call was recorded and available to the parties and the court, and the court listened to it. We also have listened to it.

The detective made the call to Dawn's brother after Dawn's brother had called and left a message. In the call, Dawn's brother said he was between 12 and 14 years old when S. and Dawn were in a relationship. He said that although he was young, he was "more mature for his age and keen enough to know" S. was a "narcissistic sociopathic type." He stated S. had anger outbursts, would throw things, and would "lie at the tip of a hat."

The detective asked if the things Dawn's brother was saying were based on things he had seen or heard, and Dawn's brother said it was based on both things he had seen and heard. The detective asked for an example of a specific instance, but Dawn's brother would not provide one. Dawn's brother vaguely described how there was a time at someone's apartment where S. was "flying off the handle" and "throwing things," "probably in an argument" with Dawn. Dawn's brother stated, "It wouldn't surprise me that there could be, you know, violence." Dawn's brother also said he "knew of [S.] as just a liar." Dawn's brother said he "would really have to sit and think" about if he witnessed any specific instances of S.'s lying or violence.

In support of the continuance request, defense counsel said Dawn's brother, who was at the time of trial living in New York, had been listed on the prosecution's witness list. Defense counsel referenced an e-mail from the prosecutor on April 22, 2019, in which the prosecutor listed Dawn's brother as one of the witnesses who she was "intending to call." Defense counsel said he had relied on the prosecutor's assurances in the e-mail and thus had assumed Dawn's brother would be present for the trial. Counsel also noted that he did not have the full recording of Dawn's brother's recorded phone call with police until the parties were addressing motions in limine in around early May 2019.

Counsel said that, on May 2, 2019, the prosecutor informed counsel she was not going to be calling Dawn's brother, and that he would not be brought to the trial. Counsel thus said he began making his own arrangements to try to bring Dawn's brother to trial. Counsel referenced efforts involving his own investigator, and e-mails to the court and the prosecutor. Counsel said the court proposed the idea of video testimony, to which the prosecutor objected. Counsel said the superior court attempted to assist with the out-of-state subpoena procedure, but that New York procedure requires a 20-day notice. Counsel said the minimum time necessary to secure Dawn's brother's appearance would be five weeks.

The prosecutor objected to a continuance, arguing that the request was untimely and would require an undue consumption of time and that Dawn's brother's testimony would not be significant anyway.

The trial court denied a continuance. The court ruled Dawn's brother did not give a sufficiently specific example of S.'s violent behavior to qualify as third-party perpetrator evidence. The court also ruled Dawn's brother did not have the medical training to determine S. was a sociopath. As to Dawn's brother's statements about S. being a liar, the court ruled those statements were inadmissible impeachment evidence because they were cumulative to other attacks on S.'s credibility, specifically during defense counsel's cross-examinations of Diane D. and S. himself. The court further said the defense would not be able to procure Dawn's brother within a reasonable amount of time.

**B. Analysis**

On appeal, Foreman does not challenge the trial court's ruling that Dawn's brother's statements of S. being a "sociopath" and of S.'s violent conduct toward Dawn were inadmissible. Instead, he only challenges the court's ruling that Dawn's brother's statements about S. being a liar were inadmissible because they were cumulative to other evidence already presented.

"The decision to continue a hearing so a party can secure the presence of a witness is one within the trial court's discretion. [Citation.] A trial court does not abuse its discretion in denying a continuance unless the defendant establishes good cause for a continuance. [Citation.] Good cause requires a defendant to show that he or she exercised due diligence in pursuing the witness's presence, the witness's expected testimony was material and not cumulative, the testimony could be obtained within a reasonable time, and the facts the witness would provide could not otherwise be proven." (*People v. Caro* (2019) 7 Cal.5th 463, 499—500.)

Foreman argues Dawn's brother's statements about S. being a liar were not cumulative. He states the other attacks on S.'s credibility via cross-examinations of Diane D. and S. himself "did not come close to providing what [Dawn's brother] would have provided—an immediate relative of [Dawn's], with a significant history with [S.], who bluntly said [S.] was a liar." We perceive this argument to be predicated on the rule that " '[e]vidence that is identical in subject matter to other evidence should not be excluded as "cumulative" when it has greater evidentiary weight or probative value.' " (*People v. Filson* (1994) 22 Cal.App.4th 1841, 1850, disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452.) However, Foreman has not demonstrated Dawn's brother's statements would have been of any greater weight or probative value regarding S.'s character for honesty or dishonesty.

First, nothing in the record, including in Dawn's brother's phone call with police, establishes that Dawn's brother had a "significant history" with S.. Indeed, the record is silent as to what kind of relationship Dawn's brother and S. had. Additionally, we fail to see how Dawn's brother's being an immediate family member of Dawn's establishes any foundation for or lends any credibility to Dawn's brother's statements. Foreman also overlooks that the trial court never found that a foundation had been established for Dawn's brother's statements of S. being a liar. The trial court, for purposes of its analysis of the cumulative nature of the proffered evidence, assumed that a foundation could be laid. But the trial court never expressly or impliedly found that a foundation existed. Thus, while Dawn's brother stated multiple times during the call that S. was a liar, there is no evidence as to how Dawn's brother knew this. Again, Dawn's brother could not tell the detective on the phone about any specific instances of S.'s lying and did not offer any other basis for his opinion that S. was a liar despite being given the opportunity to do so. Instead, it appears to us from listening to the phone call recording that Dawn's brother articulated nothing more than a visceral feeling that S. was dishonest and a generally bad person. Therefore, the trial court did not err in ruling Dawn's brother's testimony would be inadmissible, and thus did not err in denying the continuance. In light of this conclusion, we need not determine whether defense counsel was ineffective for failing to timely secure Dawn's brother's appearance at trial.

Foreman, 2022 WL 558250, at *14–15.

23

1    1.   Denial of Continuance

2         "The denial of a request for a continuance may, under unusual circumstances, result in a

3    denial of due process." Michaels v. Davis, 51 F.4th 904, 943 (9th Cir. 2022) (citing Ungar v.

4    Sarafite, 376 U.S. 575, 589 (1964)). "The matter of continuance is traditionally within the

5    discretion of the trial judge," and "[t]here are no mechanical tests for deciding when a denial of a

6    continuance is so arbitrary as to violate due process. The answer must be found in the

7    circumstances present in every case, particularly in the reasons presented to the trial judge at the

8    time the request is denied." Ungar, 376 U.S. at 589.

9         Chambers v. Mississippi, 410 U.S. 284 (1973), and Washington v. Texas, 388 U.S. 14

10   (1967), "stand for the general proposition that a defendant's right to present a defense includes

11   the right to offer testimony by witnesses and to compel their attendance." Arredondo v. Ortiz,

12   365 F.3d 778, 782 (9th Cir. 2004). In Washington, the Supreme Court found a violation of the

13   Sixth Amendment "when the defendant was arbitrarily deprived of 'testimony [that] would have

14   been relevant and material, and . . . vital to the defense[,]'" which "suggests that more than the

15   mere absence of testimony is necessary to establish a violation of the right" and that a defendant

16   "must at least make some plausible showing of how [the witness] testimony would have been

17   both material and favorable to his defense." United States v. Valenzuela-Bernal, 458 U.S. 858,

18   867 (1982) (first alteration in original) (quoting Washington, 388 U.S. at 16).

19        Here, the state courts found that the victim's brother's statements about S. being a liar

20   were inadmissible because they were cumulative to other impeachment evidence and there was

21   no evidence regarding how the brother knew S. was a liar (e.g., the brother could not tell the

22   detective during the telephone call about any specific instances when S. lied). Additionally, at

23   the time of the continuance request, defense counsel's efforts to subpoena the brother through an

24   out-of-state court procedure had proved fruitless. (25 RT[16] 3896–97.) Defense counsel also

25   admitted that the victim's brother would be a reluctant witness. (25 RT 3902.) A fairminded

26   jurist could conclude reasonably that Petitioner had not demonstrated that the victim's brother's

27   statements were material and vital to the defense, and thus, denying a (at minimum) five-week

28   _____
     [16] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 15-8.)

1    continuance to secure a reluctant witness's appearance at some speculative time in the future

2    when there was no active subpoena[17] was not violative of due process.

3         "The legal standard for determining whether a continuance violates due process affords

4    substantial discretion to a trial court." Michaels, 51 F.4th at 944. "Given that broad standard, as

5    well as the deference owed under AEDPA," id., the California Court of Appeal's rejection of

6    Petitioner's claim challenging the denial of a continuance to secure the victim's brother's

7    appearance was not contrary to, or an unreasonable application of, clearly established federal

8    law, nor was it based on an unreasonable determination of fact. The state court's decision was

9    not "so lacking in justification that there was an error well understood and comprehended in

10   existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

11   Therefore, Petitioner is not entitled to habeas relief on this claim and it should be denied.

12        2.   Ineffective Assistance of Counsel

13        As the state court did not reach the merits of the ineffective assistance of counsel claim,

14   the claim is reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009). The clearly established

15   federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466

16   U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was

17   deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish

18   deficient performance, a petitioner must demonstrate that "counsel's representation fell below an

19   objective standard of reasonableness" and "that counsel made errors so serious that counsel was

20   not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688,

21   687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong

22   presumption" that counsel's conduct falls within the "wide range" of reasonable professional

23   assistance. Strickland, 466 U.S. at 687. To establish prejudice, a petitioner must demonstrate "a

24   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

25   would have been different. A reasonable probability is a probability sufficient to undermine

26   confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result

27   would have been different. . . . The likelihood of a different result must be substantial, not just

28   _____

     [17] (25 RT 3907.)

1   conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). "[A] court

2   need not determine whether counsel's performance was deficient before examining the prejudice

3   suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an

4   ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be

5   so, that course should be followed." Strickland, 466 U.S. at 697.

6          As set forth in section III(B)(1), *supra*, a fairminded jurist could conclude reasonably that

7   Petitioner had not demonstrated that the victim's brother's statements were material and vital to

8   the defense. Similarly, here, Petitioner has not established there is a reasonable probability that

9   the result of the proceeding would have been different if counsel had timely secured the

10  appearance of the victim's brother. The victim's brother's statements about S. being a liar were

11  cumulative to other impeachment evidence. Moreover, there is nothing in the record establishing

12  that such statements would have been admissible because there is no evidence regarding how the

13  brother knew S. was a liar and any basis for the brother's opinion. Accordingly, Petitioner is not

14  entitled to habeas relief on this claim and it should be denied.

15         **C.  Admission of Evidence**

16         In his third, fourth, and fifth claims for relief, Petitioner asserts that the trial court erred in

17  admitting expert testimony, DNA evidence, and the prosecutor's reading of Petitioner's name,

18  address, and date of birth from a 1979 police report into the record. (ECF No. 1 at 5–6, 34–40.)

19         1.  Legal Standard

20         "Federal habeas courts generally do not review questions of state evidentiary law."

21  Maquiz v. Hedgpeth, 907 F.3d 1212, 1217 (9th Cir. 2018) (citing Estelle v. McGuire, 502 U.S.

22  62, 67–68 (1991)). See Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due

23  Process Clause does not permit the federal courts to engage in a finely tuned review of the

24  wisdom of state evidentiary rules[.]"). "It is well settled that a state court's evidentiary ruling,

25  even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so

26  fundamentally unfair as to violate due process." Demetrulias v. Davis, 14 F.4th 898, 907 (9th

27  Cir. 2021) (quoting Spivey v. Rocha, 194 F.3d 971, 977–78 (9th Cir. 1999)). "The Supreme

28  Court has made very few rulings regarding the admission of evidence as a violation of due

process," <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009), and has "defined the category of infractions that violate 'fundamental fairness' very narrowly," <u>Dowling v. United States</u>, 493 U.S. 342, 352 (1990). Moreover, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." <u>Holley</u>, 568 F.3d at 1101.

### 2. Expert Opinion

In his third claim for relief, Petitioner asserts that the trial court erred in admitting expert testimony that the perpetrator sexually assaulted the victim and that it was not reasonable to suggest Petitioner had consensual sex with the victim before a third party killed her. (ECF No. 1 at 5, 34–36.) Respondent argues that expert opinion admission claims are not cognizable in federal habeas and that there's no showing the opinion unreasonably rejected Petitioner's expert opinion admission claims. (ECF No. 17 at 23.) This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," <u>Wilson</u>, 138 S. Ct. at 1192, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's claim regarding admission of expert testimony, the California Court of Appeal stated:

**III. Saathoff's testimony**

Foreman contends the trial court erred in admitting Saathoff's expert testimony that Dawn's killer sexually assaulted her, and that it was not reasonable to suggest someone had sex with Dawn before someone else killed her. He argues this testimony was inadmissible on two grounds. First, he states that although it was permissible for Saathoff to opine that the murder was "sexually motivated," Saathoff was in no better position than the jurors to decide two crucial issues: whether the killer had sexual intercourse with Dawn, and whether someone else could have killed Dawn after Foreman had sex with her. Second, he contends the testimony impermissibly usurped the role of the jury by drawing ultimate inferences from the evidence, and essentially offered an opinion about Foreman's guilt. Neither ground has merit.

We begin with the first ground. " 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.*, subd. (a).)' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).) However, " ' '[w]here the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." ' " (*Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 762.) Expert testimony will be excluded " ' "when it would add *nothing at all* to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness.' " ' " (*People v. Jones* (2012) 54 Cal.4th 1, 60.)

" 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) We find no abuse of discretion on this first ground.

Saathoff opined that the murder in this case included a "nonconsensual sexual assault" based on six factors that "strongly pointed to nonconsensual sex being a part of this homicide rather than consensual sex." He stated the circumstances "strongly suggest[ ] that the sexual activity was soon followed by the homicide and that the two were related. In other words, there was a merging of the sexual assault then into the homicide[.]" He testified there was a "direct linkage between the sexual activity ... and the murder," and "the sex and the murder are tied together." Saathoff opined there was only one reasonable interpretation of what occurred: "Nonconsensual sexual assault prior to death." He testified, "It's not reasonable that someone else did it."

Foreman argues Saathoff was in no better a position than the jury to determine whether the killer had sexual intercourse with Dawn and then killed her. He explains: "Saathoff's expertise may have put him in a better position than jurors to know whether the murder was sexually motivated, but it did not offer any way for him to say whether specific sexual acts occurred between the victim and the killer. The main evidence supporting that conclusion was the sperm found in the victim's vagina, but jurors were in just as good a position as Saathoff to evaluate whether the sperm came from the killer or from a prior consensual encounter. Saathoff had no greater knowledge than jurors on that issue."

Foreman's argument operates on an overly broad concept of a "sexually motivated" homicide. He contends that if S. killed Dawn out of jealousy or possessiveness, that would constitute a "sexually motivated" homicide. This definition is completely out of step with Saathoff's use of the term "sexually motivated." Saathoff used the term much more narrowly to refer to a homicide that is connected with an act of sexual intercourse, committed by a single perpetrator.

With that clarified, we conclude the record shows Saathoff's expertise put him in a better position than the jurors to determine whether the homicide and act of sexual intercourse were committed close in time by the same person. Saathoff

drew on his expertise in sexually violent offenses to make connections and deductions from the evidence that a layperson would not be able to make. For example, Saathoff offered testimony about the pillowcase that was beyond common sense and experience. He explained the dark and wet stains on the pillowcase suggested Dawn may have been actively resisting, as some victims with a pillow over their heads will attempt to bite the perpetrator, which would explain why the pillowcase may have been taken into Dawn's mouth. From this, Saathoff could deduce Dawn was alive when the pillowcase was placed over her head and that she resisted significantly. In addition, Saathoff testified the pillowcase over the head objectifies and degrades the victim and reduces their ability to resist and escape. He also explained how the pillowcase over the head would draw one's attention to her vagina. Thus, whereas a lay person may think the pillowcase would only have a role to play in asphyxiating Dawn, Saathoff's testimony explained how the evidence was consistent with the pillowcase having been instrumental in both the sexual assault and the homicide—and not just instrumental in physically accomplishing the criminal acts, but also instrumental in attaining a certain type of psychological satisfaction for the perpetrator.

Additionally, Saathoff testified as to the significance of Dawn's nudity and placement in the bathtub. He explained nudity is arousing, and many perpetrators after committing a sexually violent crime will have a "very strong image of the individual after death, and they retain that in their mind. And so if, indeed, the victim's nude condition is one that's more arousing to the perpetrator, then the perpetrator can summon up that image of the individual if one wants to relive the event and become sexually aroused again." Saathoff also explained that the positioning of Dawn's nude body in the bathtub with her legs splayed open and vagina exposed could have been intentional. Such evidence informed the jury that the positioning of Dawn's body was not necessarily accidental, and instead she could have been posed in that particular way for the killer's sexual pleasure. Making these deductions from the evidence required specialized knowledge that someone with Saathoff's experience would have and a layperson would not. Therefore, Saathoff's expert testimony was helpful to the jury in determining whether the same person had sex with Dawn and killed her, constituting a sexually motivated homicide.[18]

We turn now to Foreman's second ground for why Saathoff's testimony was inadmissible. Foreman contends Saathoff's testimony usurped the role of the jury by "drawing ultimate inferences from the evidence, and essentially offering an opinion about [Foreman's] guilt." Specifically, he contends Saathoff's opinion that it is not reasonable that one person committed the sexual assault and another committed the murder was impermissible because it was an opinion about the reasonableness of Foreman's defense and thus about his guilt. His argument is misaligned with the applicable law. "An expert witness in California may give testimony that ' "embraces the ultimate issue to be decided by the trier of fact." ' " (*Swanson v. Marley-Wylain Company* (2021) 65 Cal.App.5th 1007, 1019.) Saathoff was allowed to offer an expert opinion about the likeliness of competing theories as to what transpired inside Dawn's apartment when she was killed. In fact, Saathoff was allowed to testify that there is only one reasonable theory as to what occurred: that a single person had sex with Dawn and then killed her. That this opinion undermined Foreman's defense does not make it inadmissible. We also note that Saathoff did not implicate Foreman specifically;

---

[18] It is noteworthy that Foreman called his own expert witness, Robert Schug, Ph.D, a clinical psychologist and Associate Professor of criminology, criminal justice, and forensic psychology at California State University, Long Beach, to present his opinions and criticisms of Dr. Saathoff's testimony on these issues.

he only opined that it was the same person who committed the sexual assault and the homicide.

There was nothing inadmissible about Saathoff's testimony.

Foreman, 2022 WL 558250, at *16–18 (footnote in original).

The state court's rejection of Petitioner's claim regarding admission of Saathoff's testimony was not contrary to, or an unreasonable application of, clearly established federal law. "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley, 568 F.3d at 1101 (citing Williams, 529 U.S. at 375). See Walden v. Shinn, 990 F.3d 1183, 1204 (9th Cir. 2021) (noting that Holley's holding "remains true"). Further, "there is no United States Supreme Court precedent 'support[ing] the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact.'" Scott v. Montgomery, 773 F. App'x 902, 902 (9th Cir. 2019) (alteration in original) (quoting Moses, 555 F.3d at 761). See Maquiz, 907 F.3d at 1217 (stating that Ninth Circuit precedent "concluded that because 'there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue . . . the admission of the opinion testimony of [the expert] cannot be said to be contrary to, or an unreasonable application of, Supreme Court precedent'" (citation omitted)). "When there is no clearly established federal law on an issue, a state court cannot be said to have unreasonably applied the law as to that issue." Holley, 568 F.3d at 1098.

Based on the foregoing, the California Court of Appeal's denial of Petitioner's claim regarding admission of Saathoff's testimony was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

30

3.  <u>DNA Evidence</u>

In his fourth claim for relief, Petitioner asserts that the trial court erred in admitting DNA evidence from vaginal slides from the coroner's office without sufficient foundation. (ECF No. 1 at 5, 36–39.) Respondent argues that this claim is not cognizable in federal habeas and that there's no showing the opinion unreasonably rejected this claim. (ECF No. 17 at 26–29.) This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," <u>Wilson</u>, 138 S. Ct. at 1192, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's claim regarding admission of DNA evidence, the California Court of Appeal stated:

**IV. Admissibility of DNA evidence**

Foreman argues the DNA evidence was inadmissible for lack of foundation, requiring reversal. We are not persuaded.

The prosecution's case relied heavily on DNA testing showing Foreman's semen was in Dawn's vagina. As stated already, the biological material from which the DNA evidence was drawn came from two sources: a rape kit that had been stored at the Bakersfield Police Department, and two vaginal slides from the Kern County Coroner's Office. The incriminating DNA test result came from three slides: two from the coroner's office and one from the rape kit. A DNA analyst from the crime lab, Sugimoto, testified that it was not possible to determine which slides contributed to the DNA profile generated that matched Foreman's DNA profile in CODIS and matched Foreman's buccal swab obtained at his arrest December 2017 arrest. Thus, Foreman contends the DNA evidence obtained from the three vaginal slides should not have been admitted because the prosecution "did not establish a sufficient foundation for the vaginal slides from the coroner's office." More specifically, he argues there were missing links in the chain of custody of the two coroner's slides that cast doubt on the integrity of the DNA evidence obtained from the slides. As we will explain, there were missing links in the chain of custody, but the facts and circumstances do not raise any serious question about the evidence's integrity.

**A. Additional background**

The prosecution presented one witness, coroner's office employee Dawn Ratliff, to testify regarding how the coroner's slides were found. Ratliff testified that, in approximately 2013, before there was any attempt to find materials from Dawn's case, coroner's office employees were conducting a general reorganization of the

31

office's warehouse, at which time they found a banker's box containing a "jumble" of many loose and unorganized slides from numerous cases. The slides were not separately packaged. Ratliff did not know who found the box. Ratliff testified she had "absolutely no idea" why slides had been put in the box, when they were put there, or who put them there. She said the coroner's office had no documentation explaining those circumstances.

Ratliff testified that coroner's office employees removed all the slides from the box and put them in manila envelopes labeled by case number. Ratliff was aware of this process but was not present when specific slides were removed from the box and packaged. She did not know who removed and packaged the slides from this case. The slides, once packaged, were arranged in a "numerical order" and placed back into the banker's box and returned to the warehouse.

Ratliff testified that, in 2015, cold case detectives contacted the coroner's office and asked if they had any materials from the Dawn Koons case. Ratliff made a request to her staff to search for any materials on the case. Another employee brought Ratliff various materials, including an envelope with the Koons coroner's office case number on it that contained two vaginal slides. One of the slides had handwritten on it the name "Koons," the coroner's office case number "C-051-79," and the word "vag." The other slide had less clear writing on it, but one could still make out the partial case number "C-05" and the letters "K-o-o." Ratliff did not know who wrote this information on the slides or when the writing occurred. The slides also had additional writing on them; Ratliff did not know how that writing got onto the slides but thought it might have occurred at the crime lab. The two slides were not individually packaged inside the envelope. Ratliff gave these slides to cold case detectives from the Bakersfield Police Department.

Ratliff said her office had no documentation of what was done to the slides in 1979. Her office also would not have documented each time the slides were moved. She also testified the storage of the slides was improper according to her training. She wrote in her report accompanying the transfer of the slides to cold case detectives the slides had not been properly stored and thus she could not guarantee the absence of cross-contamination. The prosecution did not call any other witnesses from the coroner's office to establish the chain of custody or foundation for the slides.

**B. Discussion**

Foreman contends the prosecution did not establish a sufficient foundation for admitting the DNA evidence developed from the vaginal slides because it is unknown which slides contributed to the DNA profile generated after the DNA from all three were combined. As stated, this lack of foundation argument is based on missing links in the chain of custody of the two coroner's office slides. "In a chain of custody claim, ' "[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." ' " (*People v. Catlin*

(2001) 26 Cal.4th 81, 134 (*Catlin*).) Although " 'a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering.' " (*Ibid.*) A trial court's admission of evidence over a chain-of-custody objection is reviewed for an abuse of discretion. (*Ibid.*)

Foreman focuses on the fact that the two coroner's slides were unaccounted for from 1979 until they were found around 2013, calling the unaccounted for length of time a vital missing link in the chain of custody. We agree that this constituted a break in the chain of custody. But we cannot conclude the trial court erred by finding, after " ' "taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, [that it was] reasonably certain that there was no alteration." ' " (*Catlin, supra*, 26 Cal.4th at p. 134.)

Foreman relies on this court's opinion in *People v. Jimenez* (2008) 165 Cal.App.4th 75 (*Jimenez*), one of the few published decisions to discuss in detail what type of gap in the chain of custody renders a piece of evidence inadmissible. In *Jimenez*, DNA swabs were taken from the handlebars of a bicycle used by a bank robber and abandoned near the crime scene. (*Id.* at p. 79.) A criminalist compared the DNA found on the bicycle with a reference sample supposedly taken from the defendant. (*Id.* at pp. 79—80.) The technician who purportedly collected the sample from the defendant, documented it, and sent it to the Department of Justice, did not testify. (*Id.* at p. 80.) Instead, at trial a police sergeant testified "conclusorily" that he made arrangements with a technician to take DNA swabs from the defendant and then either he or the chief investigating officer instructed someone to send the swabs to the criminalist at the Department of Justice, and the criminalist testified that he received the swabs. (*Id.* at pp. 79—80.)

A panel of this court found this chain of custody to be "woefully inadequate," concluding it "amount[ed] to nothing more than a link here, a link there, with little more than speculation to connect the links into a chain." (*Jimenez, supra*, 165 Cal.App.4th at p. 81.) Because "serious questions ar[o]se about what, if anything, the reference sample ha[d] to do with" the defendant, "the requisite showing of a reasonable certainty that there was no substitution" was not met, and reversal was required. (*Id.* at pp. 77, 81.)

We are unconvinced that the break in the coroner's slides' chain of custody leaves open "key foundational issues about the chain of custody." (*Jimenez, supra*, 165 Cal.App.4th at p. 80.) This case is distinguishable from *Jimenez*. In *Jimenez*, there were two DNA samples—one taken from the bicycle handlebars and one taken purportedly from Jimenez—neither of which could be traced with certainty to Jimenez. In Foreman's case, there were *three* DNA samples: one from the three vaginal slides, one from CODIS, and one from Foreman's 2017 buccal swab. The latter two samples unquestionably came from Foreman and were matched to the previously unknown sample from the vaginal slides. Thus, it is undeniable that Foreman's DNA was found on at least one of the three vaginal slides. The only real question then is whether it is reasonably certain that Foreman's DNA did not get onto the slides through tampering or alteration.

One explanation for how Foreman's DNA got onto the slides would be that he had sex with Dawn and ejaculated into her vagina recently before she died, and his semen was then swabbed from her vagina and placed onto at least one of the three vaginal slides at issue. Other explanations would be that his sperm cells

were planted onto at least one of the coroner's slides or inadvertently ended up on at least one of the coroner's slides through accidental cross-contamination. These latter two hypothetical explanations require the assumption that a sufficient amount of his sperm to generate a DNA profile was not on the one rape kit slide that was combined with the two coroner's slides. These latter explanations are untenable based on the facts and circumstances. Planting Foreman's sperm cells on the coroner's slides would first require someone to get a sample of his semen—something that seems utterly implausible here. The cross-contamination idea is also implausible, because that theory would imply that the coroner's office had Foreman's semen sample for a reason unconnected to this case, and that semen sample happened to accidently end up on a slide containing Dawn's vaginal material. This would be a most extraordinary coincidence.

Therefore, despite the extended period of time during which the coroner's slides were unaccounted for, the facts and circumstances do not raise any serious concerns of tampering, alteration, or cross-contamination. The trial court therefore did not err in admitting any of the DNA evidence. Any evidence concerning the chain of custody of the coroner's slides goes to the weight and not the admissibility of this evidence. (*Catlin, supra*, 26 Cal.4th at p. 134.)

*Foreman*, 2022 WL 558250, at *18–20.

The state court's rejection of Petitioner's claim regarding admission of the DNA evidence was not contrary to, or an unreasonable application of, clearly established federal law given that "there are no controlling Supreme Court decisions holding that the admission of evidence based on an inadequate chain of custody violates due process." Luckett v. Matteson, No. 18-cv-07670-HSG (PR), 2020 WL 6868834, at *14 (N.D. Cal. Nov. 23, 2020). Accord Simms v. Lynch, No. 2:21-cv-00035-DJC-JDP-HC, 2023 WL 6612657, at *6 (E.D. Cal. Oct. 10, 2023). In fact, the Supreme Court has recognized that "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n.1 (2009) (alteration in original) (quoting United States v. Lott, 854 F.2d 244, 250 (7th Cir. 1988)); id. at 336 (Kennedy, J., dissenting)). Accordingly, the California Court of Appeal's denial of Petitioner's claim regarding admission of the DNA evidence was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Therefore, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

4.   Reading of Police Report Into the Record

In his fifth claim for relief, Petitioner asserts that the trial court erred in allowing the prosecutor to read Petitioner's name, address, and date of birth from a 1979 police report into the

record. (ECF No. 1 at 6, 39–40.) Respondent argues that rejecting a prejudicial confrontation

violation claim was reasonable. (ECF No. 17 at 29–31.) This claim was raised on direct appeal in

the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned

decision. The claim was also raised in the petition for review, which the California Supreme

Court summarily denied. As federal courts "look through" summary denials and review "the last

related state-court decision that does provide a relevant rationale," Wilson, 138 S. Ct. at 1192,

this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's claim challenging the reading of Petitioner's name, address, and

date of birth from a police report into the record, the California Court of Appeal stated:

### V. Evidence of Foreman's 1979 police interview

Foreman contends the superior court erred in permitting the prosecutor to read part of Bayus's 1979 police report into the record because the report itself was inadmissible hearsay and not subject to any statutory exception to the hearsay rule. We agree the trial court erred, but conclude the error was not prejudicial.

#### A. Additional background

Detectives Bayus and Vincent interviewed Foreman on January 31, 1979, about two weeks after Dawn's body was discovered. Bayus afterwards made a report of the interview. Bayus stated in the report that he and Vincent questioned Foreman at his apartment residence because there had been a report that Foreman had harassed Dawn. The report stated that the detectives questioned Foreman about the weekend of Dawn's murder and Foreman said he "believe[d]" he was with his girlfriend, L.C., on January 12 and 13, 1979. According to Bayus's report, Foreman further said he did not know Dawn "other than to say hello to her," and that he had not been in her apartment and had never harassed her.

Bayus died before the trial in this case. Thus, the prosecution filed a brief seeking to admit Bayus's written statements in the report. There was no dispute that Foreman's statement contained in the report constituted admissions not barred by the hearsay rule, but the prosecution acknowledged that Bayus's "memorialization of the defendant's 1979 statement into the police report constitutes a second layer of hearsay which must be overcome" The prosecution argued this second layer of hearsay could be overcome by any of four possible statutory exceptions to the hearsay rule: the business records exception (Evid. Code, § 1271), the public records exception (Evid. Code, § 1280), the past recollection recorded exception (Evid. Code, § 1237), and the ancient writing exception (Evid. Code, § 1331).

The superior court held a pretrial hearing under Evidence Code section 402 at which Vincent testified. Vincent reviewed Bayus's report at the hearing. The prosecutor and court emphasized Vincent should distinguish what he independently remembered after reviewing the report versus information that he knew only from reading the report. Vincent testified all he could independently remember was speaking with Foreman and Foreman saying he had said hello to

Dawn. He testified that as to any other specifics of the conversation, he would be relying on the report.

After Vincent's testimony at the Evidence Code section 402 hearing, the court heard argument on the prosecution's motion to admit Bayus's report. The prosecutor withdrew her reliance on Evidence Code section 1280 (the public records exception), and did not offer any further argument regarding section 1331 (the ancient writing exception). She did, however, maintain Bayus's report was admissible under Evidence Code sections 1237 as a past recollection recorded and 1271 as a business record. Oral arguments focused almost entirely on Evidence Code section 1237's applicability. The trial court ultimately ruled the report was admissible under section 1237.

At trial, Vincent testified that, after reading Bayus's report, he remembered he and Bayus "talk[ing] to a person that turned out to be the suspect." As to what this person said about Dawn, Vincent said, "the one that turned out to be the suspect said that he knew that person to say 'hello' to, but had never been in her apartment and didn't know her very well." The prosecutor then asked to read Bayus's statement into the record, but the trial court instead asked the prosecutor to first attempt to refresh Vincent's recollection by having him read the report again. After Vincent read the report, the prosecutor asked if there was anything else that he independently remembered, and Vincent said he remembered "the top three paragraphs."

The prosecutor then asked if Vincent remembered anything about the man they interviewed saying he was with a woman named L.C. during the night of January 12 and 13, and Vincent said, "Yes." Vincent stated he independently remembered Foreman said he was with his girlfriend, Ms. [C.], but did not remember her whole name. The prosecutor then asked if he remembered her first name was [L.], and Vincent said, "I think so. I think so." The prosecutor then asked Vincent if he remembered the name and apartment number of the man he and Bayus interviewed, and he said, "Not right offhand."

The prosecutor then requested permission under Evidence Code section 1237 to read the suspect's name, date of birth, and address from Bayus's report into the record. The court granted permission and the prosecutor read that information from the report into the record.

**B. Evidence Code section 1237**

A trial court is given wide latitude as to whether to admit or exclude evidence, and the abuse of discretion standard is deferential to the trial court's determination. (See *Peoples, supra*, 62 Cal.4th at p. 748.) This deference applies to the court's decision whether to admit or exclude hearsay evidence. (*People v. Pirwani* (2004) 119 Cal.App.4th 770, 787.) As relevant here, the abuse of discretion standard "applies to questions about the existence of the elements necessary to satisfy [a] hearsay exception." (*Ibid.*)

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless subject to an exception, hearsay evidence is inadmissible. (Evid. Code, § 1200, subd. (b).) "Except as otherwise provided by statute," the Evidence Code applies in every action conducted before courts in this state. (Evid. Code, § 300.) The trial court correctly recognized Bayus's report was

hearsay, but incorrectly determined it was admissible under the past recollection recorded exception to the hearsay rule codified in Evidence Code section 1237.

Evidence Code section 1237, subdivision (a), provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made; [¶] (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement."

Evidence Code section 1237 requires that the person who made the statement that was contained in the proffered writing is also the witness testifying. Foreman correctly argues that the requirements of Evidence Code section 1237 were not met because Bayus, the one who made the report, was deceased and therefore could not testify. (Evid. Code, § 1237, subd. (a)(3); *People v. Simmons* (1981) 123 Cal.App.3d 677, 682, abrogated on other grounds as recognized by *People v. Gunder* (2007) 151 Cal.App.4th 412, 419, fn. 7 [Evidence Code section 1237 not applicable to cases where declarant is "absent from the hearing" because the "motive behind section 1237 is to allow previously recorded statements into evidence where the trustworthiness of the contents of those statements is attested to by the maker, subject to the test of cross-examination"].) Since Vincent did not make the report, his testimony could not be used to satisfy the elements of Evidence Code section 1237.

### C. The error was harmless

Nevertheless, reading Foreman's name, address, and date of birth from Bayus's report into the record was harmless either under the state or federal standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [federal law requires reversal unless we "declare a belief that [the error] was harmless beyond a reasonable doubt"]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [state law error requires reversal only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].) Foreman contends that without reading his name and address from the report into the record, there was "no evidence that 'the person' Vincent interviewed was [him]." This is incorrect. To the contrary, there was plenty of evidence to strongly support the inference that Foreman was the man Vincent and Bayus spoke to.

Foreman admitted in his December 2017 videotaped interview with police after his arrest that he lived in apartment 50 of the same apartment complex as Dawn. He also stated in that interview that he spoke with two detectives at his apartment shortly after the murder. He also stated he told the two detectives in 1979 something about L.C.. Vincent's testimony, however short, was consistent with these facts that Foreman relayed in his 2017 interview. Vincent stated he was with Bayus when he interviewed the man shortly after the murder, and said he remembered Foreman saying he knew the deceased victim. Vincent also testified about something Foreman said about a L.C.. It would have been an unlikely coincidence that Vincent would have interviewed some other man besides Foreman who also knew Dawn and a L.C.. The jury easily could have deduced,

1    without the reading from Bayus's report, that Foreman was the man who Vincent
2    and Bayus interviewed on January 31, 1979, at apartment 50.

3    Foreman, 2022 WL 558250, at *20–23.

4         Applying Chapman v. California, 386 U.S. 18 (1967), the California Court of Appeal
5    found to be harmless the erroneous reading Petitioner's name, address, and date of birth from
6    Bayus's report into the record. Confrontation Clause violations are subject to harmless error
7    review. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986). Under Chapman, "the test for
8    determining whether a constitutional error is harmless . . . is whether it appears 'beyond a
9    reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder
10   v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman, 386 U.S. at 24). The Supreme Court
11   has held that when a state court's "Chapman decision is reviewed under AEDPA, 'a federal court
12   may not award habeas relief under § 2254 unless *the harmlessness determination itself* was
13   unreasonable.'" Davis v. Ayala, 576 U.S. 257, 269 (2015) (quoting Fry v. Pliler, 551 U.S. 112,
14   119 (2007)). That is, Petitioner must show that the state court's harmless error determination
15   "was so lacking in justification that there was an error well understood and comprehended in
16   existing law beyond any possibility of fairminded disagreement." Ayala, 576 U.S. at 269–70
17   (internal quotation marks omitted) (quoting Richter, 562 U.S. at 103). See Mitchell v. Esparza,
18   540 U.S. 12, 18 (2003) (per curiam) ("We may not grant [the] habeas petition, however, if the
19   state court simply erred in concluding that the State's errors were harmless; rather, habeas relief
20   is appropriate only if the [state court] applied harmless-error review in an 'objectively
21   unreasonable' manner.").

22        The Court finds the state court's harmless error determination was not objectively
23   unreasonable. Even if the trial court erred in allowing the prosecutor to read Petitioner's name,
24   address, and date of birth from Bayus's report into the record, there was other properly admitted
25   evidence that supported the inference that Petitioner was the man Detectives Vincent and Bayus
26   interviewed. In his December 2017 phone calls and interview with law enforcement, Petitioner
27   stated that he knew Dawn and lived in the same complex as Dawn, spoke with two detectives at
28   his apartment shortly after the murder, and knew L.C.. (23 RT 3646–53; 6 CT 1485–88, 1501–

02, 1507, 1521.) Petitioner's December 2017 statements were consistent with Detective

Vincent's testimony that the person he interviewed with Bayus knew both the victim and a L.C..

Based on the foregoing, the California Court of Appeal's denial of Petitioner's claim

challenging the reading of Petitioner's name, address, and date of birth from a police report into

the record was not contrary to, or an unreasonable application of, clearly established federal law,

nor was it based on an unreasonable determination of fact. The state court's decision was not "so

lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly,

Petitioner is not entitled to habeas relief on his fifth claim, and it should be denied.

### D.  Felony-Murder Theory

In his sixth claim for relief, Petitioner asserts that he was denied a fair trial when the

prosecution was allowed to proceed on a theory of felony-murder that was barred by factual

findings made by the superior court at the preliminary hearing. (ECF No. 1 at 6, 40–42.)

Respondent argues that a claimed state law bar to prosecution is not cognizable in federal habeas.

(ECF No. 17 at 31–37.) This claim was raised on direct appeal in the California Court of Appeal,

Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also

raised in the petition for review, which the California Supreme Court summarily denied. As

federal courts "look through" summary denials and review "the last related state-court decision

that does provide a relevant rationale," <u>Wilson</u>, 138 S. Ct. at 1192, this Court will examine the

decision of the California Court of Appeal.

In denying Petitioner's claim regarding the felony-murder theory, the California Court of

Appeal stated:

**VI. Felony murder instruction**

As stated, the jury was instructed with two theories of first degree murder—a
premeditation theory and a felony-murder theory—and it is unknown which
theory the jury relied on to convict him. Foreman contends his conviction and
sentence must be reduced to reflect a conviction for second degree murder
because the jury was permitted to convict on first degree murder based on a
felony-murder theory barred by factual findings made by the superior court at the
preliminary hearing.

### A. Trial court proceedings

An amended complaint filed December 21, 2017, charged Foreman with one count of murder (§ 187, subd. (a)), with special circumstances under section 190.2, subdivision (a)(17)(iii) (requiring that the crime was committed during the commission of a rape or attempted rape) and section 190.2, subdivision (a)(17)(vii) (requiring that the crime was committed during the commission or attempted commission of burglary).

After the preliminary hearing, the court issued a holding order as to the count charging murder but found the special circumstances not true. The court found that the prosecution did not present sufficient evidence that a rape occurred, or that there was an entry for purposes of committing theft or rape.[19]

The prosecution then filed an information on May 16, 2018, charging Foreman with one count of murder (§ 187, subd. (a)), with the same special circumstances as stated in the amended complaint.

The defense filed a motion under section 995 challenging both the murder count and the special circumstances. The Honorable Michael G. Bush presided over the section 995 proceeding. As to the murder count, the court agreed with the first court that heard the preliminary hearing that there was sufficient evidence to support it. The court did not state any limitation regarding the theories of murder that the prosecution could rely on. The court ruled the special circumstances should be dismissed, explaining:

> "As to the 187, there's clearly sufficient evidence for the People to—or for the magistrate to make the finding the magistrate did, so the 995 status is denied. As to the enhancements, special allegations, the question is whether or not there was a factual finding or not. And I find that the magistrate made a factual finding; therefore, I'm not in a position to—well, I don't need to draw conclusions of whether or not it was correct, whether or not the charges should go forward. I just find the magistrate made a factual finding, implicit or implied, but he made it and, therefore, those allegations will—the 995 will be granted on the two special allegations and dismissed."

An amended information was filed May 6, 2019, charging Foreman with one count of murder (§ 187, subd. (a)). The amended information alleged the murder was willful, deliberate, and premeditated, and alleged a felony-murder theory under section 189.

During motions in limine, the defense objected to "any efforts by the prosecution to assert that a rape occurred" at trial, based on the previous ruling at the preliminary hearing that there was insufficient evidence of rape. The prosecution disagreed, arguing that it should be permitted to present evidence that a rape occurred, and to rely on rape as the predicate offense under a felony murder theory. The trial court agreed with the prosecution, noting that the prosecution was relying on new expert testimony from Saathoff that had not been presented at the preliminary hearing.

The jury was instructed with two theories of first degree murder—the premeditation theory and the felony-murder theory. The premeditation theory required proof that Foreman killed Dawn willfully, deliberately, and

---

[19] The Honorable Brian M. McNamara presided over both the preliminary hearing and the trial.

premeditatedly. The felony-murder theory required proof that he caused Dawn's death while committing or attempting to commit rape. We observe both these theories are codified in section 189, subdivision (a).

### B. Analysis

Foreman contends the trial court erred in permitting him to be convicted based on a felony-murder theory that was barred by "factual findings" made by the superior court at the preliminary hearing. He also precautionarily argues that if this court were to find forfeiture, his counsel was ineffective for failing to preserve the issue for appeal. We conclude the trial court did not err.

Foreman is correct that both the rape and burglary special circumstances were dismissed at the preliminary hearing and upon the section 995 motion on the basis of an insufficiency that could also have applied to a felony-murder theory of first degree murder. This was because the prosecution did not present sufficient evidence that a rape occurred, or that there was an entry for purposes of committing theft or rape. However, the superior court at the preliminary hearing did not make any factual findings inimical to a rape charge. In that same vein, the court did not rule that felony murder could not be asserted. Rather, it stated there was sufficient cause as to the murder charge. This distinction ultimately renders defendant's claim unavailing.

Both parties discuss *People v. Davis* (1995) 10 Cal.4th 463 (*Davis*). There, in pretrial proceedings on a section 995 motion, the trial court dismissed a charge of attempted rape and assault to commit rape as to one of the victims, as well as a special circumstance of felony-murder rape. (*Davis, supra,* 10 Cal.4th at pp. 487—488.) "Prior to opening statements, the prosecutor informed defendant and the trial court that he would nonetheless seek to present evidence on first degree felony murder with the underlying felony of attempted rape. Defendant acknowledged, 'I have notice,' but objected on statutory and due process grounds. The trial court ruled that it would permit an instruction on felony-murder rape if the prosecution produced evidence in support of that theory." (*Id.* at p. 512.) After concluding the prosecution had done so, the trial court instructed the jury on felony murder based on rape or attempted rape. (*Id.* at p. 513.) On appeal, the defendant claimed this was error and a violation of his right to due process on the theory of inadequate notice. (*Ibid.*) Our Supreme Court rejected this claim. (*Ibid.*)[20]

The defendant in *Davis* also argued that without a prior commitment order, the trial court lacked jurisdiction to hear the case on a theory of felony-murder rape. (*Davis, supra,* 10 Cal.4th at p. 514.) Our Supreme Court held that because there was a commitment order naming the charge of murder, jurisdiction had been established. (*Ibid.*) Quoting from *People v. Bernard* (1994) 27 Cal.App.4th 458, 470 (*Bernard*), disapproved on another ground in *People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7, which we discuss next, the court explained that felony murder and premeditated murder are not distinct crimes, and it is not necessary to separately charge a defendant with felony-murder. (*Davis*, at p. 514.) Additionally, "in ruling on the ... section 995 motion, the trial court found sufficient evidence to support the murder charge; it made no *factual finding* concerning the *theories* that could support the charge, including the theory of felony-murder rape. It therefore retained jurisdiction to hear the murder charge on a theory of felony-murder rape." (*Ibid.*, first italics added.)

---

[20] Foreman does not appear to raise a lack of notice claim in his briefing.

In *Davis*, the defendant also argued that " 'something like collateral estoppel or res judicata' " should have precluded the use of a felony-murder rape as a theory of first degree murder after rape charges were dismissed. (*Davis, supra*, 10 Cal.4th at p. 514.) Our Supreme Court rejected these arguments as well. (*Ibid.*) The court explained in footnote 10 that none of its requirements for double jeopardy, res judicata, or collateral estoppel were satisfied. (*Id.* at pp. 514—515, fn. 10.) As relevant to this proceeding, it added, "Neither the magistrate at the preliminary hearing nor the judge at the pretrial ... section 995 hearing made any *factual findings* with respect to the dismissed counts of rape, attempted rape, or special-circumstance felony-murder rape. Indeed, as defendant concedes, the prosecution was free, among other options, to reinstate the dismissed charges [citation] or amend the complaint. Dismissal of the charges put defendant in the same position he would have been in if they had not been filed." (*Id.* at p. 514, fn. 10, italics added.)

Foreman argues *Davis* is distinguishable because, here, the court made a "factual finding" that the prosecution's evidence failed to establish a temporal or causal connection between the rape or burglary and the murder that would be necessary for felony-murder. *Davis* did not expressly define the phrase "factual finding," but its use in footnote 10 suggests the term is used consistently with our Supreme Court's jurisprudence regarding when an information may charge an offense that was not named in the commitment order and was specifically rejected by the magistrate: "[W]here the magistrate makes *factual findings* which are fatal to the asserted conclusion that a particular offense was committed, the district attorney may not recharge that offense in the information. A clear example of this would be where the magistrate expresses disbelief of a witness whose testimony is essential to the establishment of some element of the corpus delicti. [¶] Where, however, the magistrate either expressly or impliedly accepts the evidence and simply reaches an ultimate legal conclusion therefrom—i.e., whether or not such evidence adds up to reasonable cause that the offense had been committed—such conclusion is open to challenge by inclusion in the information which action is thereafter subject to attack in the superior court under ... section 995, and ultimately to appellate review." (*People v. Farley* (1971) 19 Cal.App.3d 215, 221, italics added.) In dismissing the special circumstance allegations at the preliminary hearing, as in *Davis*, the superior court did not make any factual findings. It did reach the legal conclusion that the evidence was insufficient to support the special circumstances allegation for a reason that could also apply to a felony-murder charge without explicitly stating this to be the case. That is not sufficient to distinguish *Davis*, or bar the prosecution from proceeding on a felony-murder theory.

In *Bernard*, the defendant argued on appeal that he was deprived of his constitutional right to notice of the charge against him when the trial court permitted the prosecution to present to the jury theories of felony-murder kidnapping and felony-murder kidnapping for robbery after the kidnapping special circumstances were dismissed on a section 995 motion prior to trial (a special circumstance of felony-murder robbery was not dismissed). (*Bernard, supra*, 27 Cal.App.4th at p. 469.) As we previously indicated, the appellate court explained it was not necessary to separately charge defendant with felony murder. (*Id.* at p. 470.) The court also stated that because the underlying felonies had been charged (as is true in this action), "[t]he amended information clearly put [the defendant] on notice the prosecution would press for felony murder." (*Ibid.*) The evidence and the defendant's theory of defense also put him on notice. (*Ibid.*) The opinion provides no specifics regarding the basis on which the section 995 motion

was granted. This silence, however, suggests the reasoning behind the ruling is of no relevance. What is important is that the section 995 motion was only directed at the special circumstances and the murder charge was adequate as pled and was never dismissed.

Foreman relies on *People v. Saez* (2015) 237 Cal.App.4th 1177 (*Saez*) to support his argument that the prosecution was precluded from revisiting the superior court's section 995 ruling. That case is inapposite.

In *Saez, supra*, 237 Cal.App.4th 1177, as relevant to this appeal, the defendant unsuccessfully moved to dismiss from the original information an attempted murder charge but successfully moved to dismiss the accompanying allegation that the crime was deliberate and premeditated. (*Id.* at p. 1182.) Notwithstanding the court's oral ruling to this effect, the minute order incorrectly reported that the section 995 motion was denied. (*Saez, supra*, at p. 1182.) Over three years later, the People filed an amended information that included a premeditation allegation. (*Id.* at p. 1184.) At a subsequent hearing before a second judge, and with new counsel appearing for both sides, the court clerk represented that the section 995 motion had been denied and defense counsel did not contradict this representation. (*Saez, supra*, at p. 1184.) The jury found the defendant guilty of attempted murder and found true that the crime was deliberate and premeditated. (*Id.* at p. 1183.) The appellate court held the defendant's conviction for attempted premeditated murder could not be sustained because the premeditation allegation was dismissed and not properly realleged. (*Id.* at pp. 1183—1184.) The court explained that "[a] trial court 'generally has the authority to correct its own prejudgment errors.' [Citation.] 'Different policy considerations, however, are operative if the reconsideration is accomplished by a *different* judge [, and] ... the general rule is just the opposite: the power of one judge to vacate an order made by another judge is limited.' [Citation.] 'For one superior court judge, no matter how well intended, even if correct as a matter of law, to nullify a duly made, erroneous ruling of another superior court judge [improperly] places the second judge in the role of a one-judge appellate court,' and thus 'an order " ' " 'made in one department during the progress of a cause can neither be ignored nor overlooked in another department ....' " ' " ' " (*Id.* at pp. 1184—1185.) The second judge lacked the ability to permit the information to be amended to allege premeditation. (*Id.* at p. 1185.) The first judge's ruling established that the defendant was committed without reasonable or probable cause supporting the premeditation allegation, and dismissed the allegation accordingly. (*Ibid.*) The People could have appealed the ruling or filed a new accusatory pleading that would have required a new preliminary hearing, but they did neither. (*Ibid.*) Thus, the error was prejudicial because "it resurrected an allegation whose dismissal the prosecution never properly challenged and that never should have been tried." (*Id.* at p. 1187.)

Foreman argues that, here, the prosecution was bound by the superior court's section 995 ruling because it neither appealed the ruling, nor dismissed the charges and filed a new accusatory pleading. But this argument fails, and *Saez* is distinguishable, because the information never pled—nor was it required to plead—the felony-murder theory, and the court never dismissed the felony-murder theory. There was nothing to appeal or amend. (Compare *People v. Williams* (2005) 35 Cal.4th 817, 830 [magistrate's order after preliminary hearing determining that wobbler offenses were misdemeanors was not appealable because it did not set aside any portion of the complaint], with *People v. McKee* (1968) 267 Cal.App.2d 509, 513 [order directing district attorney to file an

amended information charging defendant with voluntary manslaughter was appealable because it was tantamount to a dismissal of murder charge].)

Defendant also relies on *People v. Graff* (2009) 170 Cal.App.4th 345 (*Graff*). It too is inapplicable. In *Graff*, the Court of Appeal reversed the defendant's convictions on two counts of committing a lewd or lascivious act on a child of 14 or 15 years in violation of section 288, subdivision (c), "because the jury was permitted to convict based on charges not established at the preliminary hearing." (*Graff, supra*, at p. 349.) The defendant was initially charged with six such counts as to Victim 1. (*Ibid.*) At the preliminary hearing, the victim testified to five incidents, two of which involved defendant watching her masturbate. (*Id.* at p. 350.) Because the victim was not certain whether the masturbation incidents occurred before or after she turned 16 years old, the magistrate dismissed the two counts that were based on these incidents and matched the remaining counts with a specific incident from Victim 1's testimony. (*Id.* at p. 351 & fn. 7.) After the hearing, an information was filed conforming to the commissioner's rulings and charging the defendant with three counts of violating section 288, subdivision (c) as to Victim 1. (*Graff, supra*, at p. 351.)

At trial, Victim 1 was allowed to testify concerning the masturbation incidents as indicative of motive or intent under Evidence Code section 1101. (*Graff, supra*, 170 Cal.App.4th at pp. 352-353 & fn. 10.) This time, she testified she was 15 years old when the first incident occurred, but was unsure when the second incident occurred. (*Id.* at p. 354.) During closing argument, defense counsel stated there were "[n]o charge[s] concerning the masturbation episodes." (*Id.* at p. 357.) In rebuttal, the prosecutor disagreed and argued the defendant could be convicted of "any lewd act that he committed with [Victim 1] while she was 14 or 15 years old," including the masturbation incidents. (*Id.* at p. 358, italics omitted.) The jury convicted the defendant of two counts of violation of section 288, subdivision (c) as to Victim 1. (*Graff, supra*, at p. 360.)

The Court of Appeal reversed, holding the defendant's "due process rights to notice of the charges against him were violated by the prosecution's decision to go forward with charges not established at the preliminary hearing." (*Graff, supra*, 170 Cal.App.4th at p. 360.) The court began its analysis by explaining the prosecution did not and could not have filed an information containing the charges not found true by the commissioner because a charge may be asserted or reasserted only when the magistrate incorrectly concluded the evidence presented at the preliminary hearing was insufficient. (*Id.* at pp. 360—361; see § 739 [information "may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed"].) A review of the evidence presented at the preliminary hearing established the commissioner's ruling was correct. (*Id.* at p. 361.) "The commissioner ... made specific findings concerning which incidents were supported by an adequate factual basis and which were not, and dismissed the latter. As there was no valid basis to challenge the commissioner's ruling and no attempt was made to refile the charges, the prosecution's sole option was to go forward on the remaining charges. Instead, the prosecutor chose to ignore the commissioner's ruling, misinform the jury, and secure convictions on charges not properly before the court." (*Id.* at p. 367.) *Graff* is inapplicable because here the prosecution did not need to amend the information to proceed on a theory of felony murder, nor did it need to challenge the superior court's ruling to do so.

Foreman's assertion that the superior court's ruling on his section 995 motion barred the jury from convicting him of first degree murder on a felony-murder theory is without merit. Having addressed the issue on the merits, we need not address any forfeiture or ineffective assistance claims.

### C. Two-dismissal rule

Alternatively, Foreman argues the trial court's decision to permit the allegation of felony murder based on rape violated the two-dismissal rule. He is incorrect.

Section 1387, subdivision (a), reads in part:

> "An order terminating an action pursuant to this chapter, or Section 859b, 861, 871, or 995, is a bar to any other prosecution for the same offense if it is a felony ... and the action has been previously terminated pursuant to this chapter, or Section 859b, 861, 871, or 995 ...."

As relevant here, our Supreme Court has held that "[a] dismissal of a special circumstance allegation under section 871 is 'an order terminating an action' under section 1387." (*Ramos v. Superior Court* (1982) 32 Cal.3d 26, 34 (*Ramos*).)

Foreman contends the "first dismissal" for purposes of the two-dismissal rule codified in section 1387 occurred after the preliminary hearing when the court dismissed *both* special circumstances under section 871. Section 871 states: "If, after hearing the proofs, it appears either that no public offense has been committed or that there is not sufficient cause to believe the defendant guilty of a public offense, the magistrate shall order the complaint dismissed ...." He contends the second dismissal occurred when the trial court granted his section 995 motion and ordered the special circumstances dismissed.

The error in Foreman's line of reasoning is that a court's order of dismissal under section 871 is not always an "order terminating the action" within the meaning of section 1387. Instead, whether a section 871 dismissal is an order terminating an action under section 1387 depends on the circumstances.

"The prosecution may treat the dismissal as a final termination of the action and start over with a new action by filing a second complaint and having a second preliminary hearing. In that situation, the magistrate's dismissal of the complaint under section 871 terminates the first action. (*Ramos* [, *supra*,] 32 C[al].3d 26, 35, [...]; *People v. Superior Court (Martinez)* (1993) 19 C[al].A[pp].4th 738, 744, [...]; see *In re Williams* (1985) 164 C[al].A[pp].3d 979, 982, [...] [magistrate's failure or refusal to hold defendant to answer a charge constitutes termination, even if there is no formal order of dismissal].)" (5 Witkin, Cal. Criminal Law (4th ed. 2021) Criminal Trial, § 488.)

"Where a defendant is held to answer on at least one count, [section] 739 (4 Cal. Crim. Law (4th), Pretrial Proceedings, § 199 et seq.) authorizes the prosecution to proceed in the same case by filing an information charging the defendant with the offense named in the order of commitment or any other offense shown by the evidence to have been committed. Under this procedure, there is no second preliminary hearing, and the magistrate's dismissal does not constitute a prior termination of the action. (*People v. Superior Court (Martinez), supra*, 19 C[al].A[pp].4th 745 [magistrate dismissed one of two counts, prosecution filed information charging both counts; subsequent dismissal under [section] 1385 was only first termination]; see [section] 1387(c)(3), infra, § 489 [subsequent

dismissal is no bar where previous termination was pursuant to [section] 995 after magistrate's dismissal under [section] 871 and prosecution recharged offense under [section] 739].)" (5 Witkin, Cal. Criminal Law (4th ed. 2021) Criminal Trial, § 488.)

"Where the action has been terminated in a previous prosecution, however, the magistrate's refusal at a second preliminary hearing to hold the defendant to answer on earlier dismissed charges terminates the action within the meaning of [section] 1387, even though the magistrate holds the defendant to answer on other charges and the prosecution attempts to reinstate the complaint under [section] 739. (*Ramos* [, *supra*,] 32 C[al].3d 35; see *Bodner v. Superior Court* (1996) 42 C[al].A[pp].4th 1801, 1806, [...] [same; distinguishing *Martinez* as involving only one prosecution, not two as here and in *Ramos*].)" (5 Witkin, Cal. Criminal Law (4th ed. 2021) Criminal Trial, § 488.)

Because Foreman was held to answer on the murder count at the preliminary hearing, the prosecution was allowed to proceed in the same case by filing an information charging him with that crime and any other offense (or special circumstance) shown by the evidence to have been committed. (5 Witkin, Cal. Criminal Law (4th ed. 2021) Criminal Trial, § 488; *Ramos, supra*, 32 Cal.3d at p. 34.) Under that procedure, the court's dismissal at the preliminary hearing of the special circumstances under section 871 did not constitute a prior termination of the action.

Foreman, 2022 WL 558250, at *23–29 (footnotes in original).

Whether the superior court's ruling on Petitioner's section 995 motion barred the jury from convicting Petitioner of first-degree murder on a felony-murder theory or whether the two-dismissal rule precluded the allegation of felony murder based on rape concern issues of state law and such claims are not cognizable in federal habeas corpus. See Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (per curiam) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."); Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996) (citations omitted) ("We accept a state court's interpretation of state law, and alleged errors in the application of state law are not cognizable in federal habeas corpus."). Accordingly, Petitioner is not entitled to federal habeas relief on his sixth claim, and it should be denied.

### E.  Cumulative Error

In his seventh claim for relief, Petitioner asserts that his conviction must be reversed based on the cumulative effect of the combined errors at trial. (ECF No. 1 at 6, 42.) Respondent

1   does not address this claim in the answer. This claim was raised on direct appeal in the California

2   Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision.

3   However, the claim was not raised in the petition for review filed in the California Supreme

4   Court, and thus, is unexhausted.[21] However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may

5   deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not

6   raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005)

7   (adopting the standard set forth in Granberry v. Greer, 481 U.S. 129, 135 (1987)).

8        "The Supreme Court has clearly established that the combined effect of multiple trial

9   court errors violates due process where it renders the resulting criminal trial fundamentally

10  unfair. . . . even where no single error rises to the level of a constitutional violation or would

11  independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing

12  Chambers v. Mississippi, 410 U.S. 284, 298, 302–03, 290 n.3 (1973)). The Ninth Circuit has

13  "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry'

14  of otherwise harmless errors, such that they amplify each other in relation to a key contested

15  issue in the case." Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) (citing Parle, 505

16  F.3d at 933). For example, in Parle, "*all* of the improperly excluded evidence . . . supported

17  Parle's defense that he lacked the requisite state of mind for first-degree murder; at the same

18  time, *all* of the erroneously admitted evidence . . . undermined Parle's defense and credibility

19  and bolstered the State's case." Parle, 505 F.3d at 930.

20       Here, the Court has found that the state court's denials of Petitioner's six specific claims

21  for habeas relief were not contrary to, or an unreasonable application of, clearly established

22  federal law. There were no trial errors with respect to the first, second, third, fourth, and sixth

---

23  [21] A petitioner in state custody who is proceeding with a petition for writ of habeas corpus must exhaust state
24  judicial remedies. 28 U.S.C. § 2254(b)(1). A petitioner can satisfy the exhaustion requirement by providing the
    highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court.
25  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor,
    404 U.S. 270, 276 (1971). To provide the highest state court the necessary opportunity, the petitioner must "fairly
26  present" the claim with "reference to a specific federal constitutional guarantee, as well as a statement of the facts
    that entitle the petitioner to relief." Duncan, 513 U.S. at 365; Gray v. Netherland, 518 U.S. 152, 162-63 (1996). "Fair
27  presentation requires that the petitioner 'describe in the state proceedings both the operative facts and the federal
    legal theory on which his claim is based so that the state courts have a "fair opportunity" to apply controlling legal
28  principles to the facts bearing upon his constitutional claim.'" Davis v. Silva, 511 F.3d 1005, 1009 (9th Cir. 2008)
    (citation omitted).

1   claims for relief. With respect to the fifth claim for relief, the Court has found that the state
2   court's harmlessness determination not contrary to, or an unreasonable application of, clearly
3   established federal law. As there was only one instance of error, there cannot be a "unique
4   symmetry" of errors that "amplify each other in relation to a key contested issue in the case."
5   Ybarra, 656 F.3d at 1001. See Lopez v. Allen, 47 F.4th 1040, 1053 (9th Cir. 2022) ("Because
6   Petitioner has failed to establish multiple errors of constitutional magnitude, there can be no
7   accumulation of prejudice amounting to a denial of due process[.]"). Accordingly, the Court
8   finds that it is "perfectly clear" that Petitioner does not raise a colorable cumulative error claim
9   and may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

10      **F.  Stay and Abeyance**

11      Petitioner has filed a motion for post-conviction DNA testing pursuant to California
12   Penal Code section 1405. (ECF No. 23 at 14.) Petitioner requests that the Court stay the instant
13   matter "until the finalization of the Sate Court adjudication of the Penal Code § 1405
14   proceedings." (Id. at 14–15.)

15      Under Rhines v. Weber, 544 U.S. 269 (2005), "stay and abeyance" is available only in
16   limited circumstances, and only when: (1) there is "good cause" for the failure to exhaust; (2) the
17   unexhausted claims are not "plainly meritless"; and (3) the petitioner did not intentionally
18   engage in dilatory litigation tactics. 544 U.S. at 277–78. Under Kelly v. Small, 315 F.3d 1063
19   (9th Cir. 2002), a three-step procedure is used: (1) the petitioner amends his petition to delete any
20   unexhausted claims; (2) the court in its discretion stays the amended, fully exhausted petition,
21   and holds it in abeyance while the petitioner has the opportunity to proceed to state court to
22   exhaust the deleted claims; and (3) once the claims have been exhausted in state court, the
23   petitioner may return to federal court and amend his federal petition to include the newly-
24   exhausted claims. 315 F.3d at 1070–71. However, the Court "not limited to considering a
25   *Rhines*/*Kelly* stay," Duke v. Gastelo, 64 F.4th 1088, 1099 (9th Cir. 2023), and "may, with
26   propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay
27   of an action before it, pending resolution of independent proceedings which bear upon the case,"
28   Leyva v. Certified Grocers of California, Ltd., 593 F.2d 857, 863 (9th Cir. 1979).

1    The Ninth Circuit has "decline[d] to use the stay-and-abeyance procedure outlined in

2    *Rhines* and ordinarily reserved for mixed habeas petitions to allow [a habeas petitioner] to

3    develop his claim based on new evidence," noting that "[t]he proper method for obtaining relief

4    is to seek leave to file a second habeas petition." Ayala v. Chappell, 829 F.3d 1081, 1104 (9th

5    Cir. 2016). Additionally, a stay is not warranted under Gonzalez v. Wong, 667 F.3d 965 (9th Cir.

6    2011) (staying federal habeas case to give petitioner the opportunity to present to the state court

7    evidence first adduced in federal court that gave rise to a potentially meritorious claim). Here,

8    the circumstances do not weigh in favor of the Court exercising its discretion to grant a stay.

9    Petitioner has filed a motion for post-conviction DNA testing pursuant to California Penal Code

10   section 1405. Even if the motion is granted, the "DNA testing . . . may yield exculpatory,

11   incriminating, or inconclusive results." Skinner v. Switzer, 562 U.S. 521, 536 (2011). Further,

12   only after section 1405 proceedings have concluded and DNA testing yielded exculpatory results

13   could Petitioner then begin the process of exhausting any potential actual innocence claim.

14   "Generally, stays should not be indefinite in nature," and "[a] stay should not be granted unless it

15   appears likely the other proceedings will be concluded within a reasonable time." Dependable

16   Highway Exp., Inc. v. Navigators Ins. Co., 498 F.3d 1059, 1066 (9th Cir. 2007) (citations and

17   internal quotation marks omitted). Given that Petitioner's state proceedings will not be

18   concluded in the foreseeable future and that any potential actual innocence claim is based on

19   mere speculation at this point, a stay is not warranted. See Hamilton v. Muniz, No. CV 16-

20   02092-AG (JDE), 2017 WL 8776672, at *17 (C.D. Cal. Dec. 7, 2017) (collecting cases of

21   denials of stays pending litigation of DNA testing motions). "The proper method for obtaining

22   relief is to seek leave to file a second habeas petition" in the event the DNA testing yields

23   exculpatory results. Ayala, 829 F.3d at 1104.

## V.

## RECOMMENDATION

26   Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of

27   habeas corpus be DENIED and Petitioner's request for a stay be DENIED.

28   ///

1        This Findings and Recommendation is submitted to the assigned United States District

2   Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

3   Rules of Practice for the United States District Court, Eastern District of California. Within

4   **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

5   written objections with the court and serve a copy on all parties. Such a document should be

6   captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

7   objections shall be served and filed within fourteen (14) days after service of the objections. The

8   assigned United States District Court Judge will then review the Magistrate Judge's ruling

9   pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within

10  the specified time may waive the right to appeal the District Court's order. Wilkerson v.

11  Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th

12  Cir. 1991)).

13

14  IT IS SO ORDERED.

15      Dated:   **November 7, 2023**      /s/ _Erica P. Grosjean_

16                              UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28